## ESBRÍ *v.* SUCESIÓN SERRALLÉS.

### CASACIÓN procedente de la Corte de Distrito de Ponce.

No. 74.—Resuelto en Junio 28, 1902.

CASACIÓN.—Cuando en la apreciación de las pruebas la Sala sentenciadora hubiere incurrido en algún error de hecho ó de derecho, es indispensable que en el escrito interponiendo el recurso se exprese, si se estuviere en el primer caso, el acto ó documento auténtico que demuestre la equivocación evidente del juzgador ; y si en el segundo, la ley ó doctrina legal relativa al valor de las pruebas, que haya sido infringida, sin cuyo requisito no es procedente ádmitir el recurso.

CONTRATOS.—No incurre en error de derecho el Tribunal que, consagrando la fuerza y eficacia de las obligaciones, dá efecto á las clausulas de un contrato, con sujeción estricta y literal á los términos de las mismas, cuando en ellas aparece, con expresión clara y explícita, la voluntad de las partes contratantes.

En el caso de autos una de las partes se comprometió á pagar á la otra, en determinados plazos, la cantidad de diez y ocho mil pesos moneda comercial, sea cual fuere el cuño de la moneda que con tal carácter circule ó esté aceptada, á razón de *cien centavos* de la moneda circulante *por cada un peso.*

*Se resolvió:*

(*a*)    PRECIO CIERTO.—CONTRATOS ALEATORIOS.—Que en el contrato se ha estipulado un *precio cierto,* y que no puede estimarse desvirtuado por las condiciones del pago, que aunque de naturaleza *aleatoria,* están establecidas en el contrato y mútuamente aceptadas por las partes, y son perfectamente lícitas y admisibles con arreglo á derecho ; y

(*b*)    PAGO DE OBLIGACIONES.—Que el deudor viene obligado á pagar hoy los plazos estipulados á razón de cien centavos de la moneda americana, que es la circulante, por cada un peso de la moneda mejicana.

ID.—Aunque con arreglo á la Ley Orgánica de Abril 12, 1900, todas las deudas pendientes en la fecha en que empezó á regir habían de pagarse en la moneda de Puerto Rico que circulaba en aquella fecha, ó en moneda de los Estados Unidos al tipo de cambio establecido, esa disposición ha de entenderse sin perjuicio de los derechos adquiridos por virtud de contratos anteriores, en que las partes hubieren convenido una manera distinta de realizar el pago de sus obligaciones, en relación á los cambios que pudieran operarse en el valor de la moneda, y bajo el amparo de las leyes que los regulaban y regían á la fecha en que fueron celebrados.

### No. 74.—Decided June 28, 1902.

APPEAL IN CASSATION.—When in the consideration of evidence the trial court has committed an error of fact or of law, it is indispensable that said error be clearly stated in the writing by which the appeal is taken setting forth, in the former case, the act or authentic document which shows the evident error of the judge, and, in the latter, the law or legal doctrine relating to the value of evidence, alleged to have been violated, without which requisites the appeal will not be allowed.

CONTRACTS.—The court commits no error if, respecting the force an efficacy of obligations, it gives effect to the clauses of a contract, in strict and literal compliance with the terms thereof, when in such clauses a clear and explicit expression of the will of the contracting parties appears.

In the case at bar, one of the parties agreed to pay the other, in specified instalments, the sum of eighteen thousand dollars, commercial money, whatever might be the coin in circulation or admitted as such, at the rate of *one hundred cents*, of the current money, *for each and every peso.* *Held:*

(*a*)  PRICE CERTAIN.—ALEATORY CONTRACTS.—That in the contract a *price certain* had been stipulated, and that it can not be considered as rendered void by the conditions for payment, which, although of an aleatory character, are set forth in the contract and, being mutually accepted by the parties, are perfectly legal adm admissible under the law:

(*b*)  SATISFACTION OF DEBTS.—That the debtor is now bound to make the stipulated payments, at the rate of one hundred cents of United States currency, which is the circulating medium, for every *peso* of Mexican money.

ID.—Al though under the Organic Act, of April 12, 1900, all debts owing on the date said Act took effect were made payable in the Porto Rican coins then in circulation, or in the coins of the United States at the established rate of exchange, this provision should be understood without prejudice to rights acquired by virtue of previous contracts in which the parties have agreed upon a different manner of satisfying their obligations with respect to the changes that might be brought about in the value of the circulating medium, and under the protection of the laws governing such contracts at the time they were made.

INTERPRETACIÓN DE LOS CONTRATOS.—Siendo claros los términos en que aparezca redactado un contrato, y no ofreciendo duda alguna sobre la intención de las partes contratantes, los Tribunales han de limitarse á aplicar sus cláusulas en su sentido literal.

APRECIACIÓN DE LAS PRUEBAS.—La apreciación que de las pruebas practicadas en el juicio hubiere hecho el Tribunal sentenciador, debe ser respetada por el Tribunal de Casación, á no ser que se demuestre, en la forma legal correspondiente, que hubiere incurrido en error.

CONTRATOS.—El contrato es ley entre las partes contratantes, y siendo igual para todos, no quebranta la reciprocidad de intereses que debe existir entre ambas partes.

## EXPOSICIÓN DEL CASO.

*Resultando:* que por escritura pública otorgada en la ciudad de Ponce, ante el Notario de la misma Don Joaquín Mayoral, como encargado del protocolo del de la misma clase Don Rafael León, que se encontraba en uso de licencia en 1? de Septiembre de 1894, Don José Nicolás de Cartagena y Mangual vendió á Don Juan Serrallés y Colón, representado en el acto del otorgamiento de la escritura por su administrador y apoderado general Don Eduardo Wellemkamp y Chelva, la participación proindivisa que le correspondía en la Hacienda de cañas dulces, denominada "Úrsula" radicada en el barrio de la "Cintrona", del término municipal de Juana Diaz, en precio y cantidad de diez y ocho mil pesos, moneda comercial, á pagar en los diferentes plazos que se detallan en la 2ª cláusula de dicha escritura, ó sea "á razón de dos mil pesos el día 15 de Julio del año de 1898; otros dos mil pesos en igual día y mes de 1899; igual suma en 15 de Julio de 1900; y tres mil pesos en cada día 15 de Julio de los años de 1901 al 1904, ambos inclusives, tódos de moneda corriente en el comercio, sea cual fuere el cuño de la moneda que con tal carácter circule, ó esté aceptado en esta Provincia, á razón de cien centavos de la moneda circulante, por cada un peso, y con exclusión de toda clase de papel moneda creado, ó por crear, aún cuando su circulación fuere forzosa", cuyos plazos devengarían el interés del diez por ciento anual, desde el otorgamiento de la escritura, pagaderos por trimestres vencidos, y quedando hipotecada la misma participación vendida, á la seguridad

INTERPRETATION OF CONTRACTS.—When the terms of a contract are clear and leave no doubt as to the intention of the contracting parties, courts must confine themselves to a literal application of the clauses thereof.

CONSIDERATION OF EVIDENCE.—The consideration by the trial court of the evidence introduced at the trial should be respected by the court of cassation unless it be shown, in the proper legal manner, that an error had been committed.

CONTRACTS.—A contract is the law between the contracting parties, and being equal for all, it does not impair the reciprocity of interests that should exist between both parties.

## STATEMENT OF THE CASE.

By public deed made and executed in the City of Ponce, before the Notary Joaquin Mayoral, having charge of the protocol kept by Notary Rafael León, who was away on leave of absence, on September 1, 1894, José Nicolás de Cartagena y Mangual sold to Juan Serrallés y Colón, represented by his attorney in fact, Eduardo Wellenkamp y Chelva, his undivided interest in the sugar-estate called "Ursula", situated in *Barrio* "Cintrona", within the Municipal District of Juana Diaz, for the sum of eighteen thousand *pesos* commercial money, payable in several instalments specified in clause 2 of the aforesaid instrument, namely: ".two thousand *pesos* on the 15th day of July, 1898; two thousand *pesos* on the 15th of July, 1899, an equal amount of two thousand *pesos* on the 15th day of July of the year 1900, and three thousand *pesos* on every 15th day of July of the years 1901 to 1904, both inclusive; all in current money of commerce, whatever the coinage of money may be, and of such character as may be circulating or be accepted in this Province, at the rate of one hundred cents of the circulating money for every *peso*, and to the exclusion of all kinds of paper money established, or which may be established, although it may be legal tender; which deferred payments should bear interest at the rate of ten per cent. per annum, from the date of the execution of the deed, payable at the expiration of every quarter; the aforesaid undivided interest in the property being mortgaged as security for the instalments and interest agreed upon; in

de los plazos é intereses estipulados; declarando los contra-
tantes en la cláusula séptima que el precio porque tenía
lugar dicha venta era el justo y verdadero valor "hoy" ó
sea en el día de la fecha de la escritura, de la participación
enagenada; y en la octava, que para los efectos del artículo
127 de la Ley Hipotecaria, declaraban también los otorgan-
tes, que el precio de la participación hipotecada, era el de
diez y ocho mil pesos, moneda corriente, renunciando á
todo nuevo avalúo ó acción encaminada á este fin; pues
quedaban bien impuestos de que ese precio era el que había
de servir de tipo para la subasta que se celebrara, si la obli-
gación no fuere satisfecha y hubiere que interponerse recla-
mación judicial para el pago.

*Resultando:* que habiendo incurrido en error Don José
Nicolás de Cartagena, al vender, en la escritura de que se
ha hecho mérito, la participación expresada de la Hacienda
"Úrsula", como de su exclusiva propiedad, siendo así que,
habiéndola adquirido constante su matrimonio con su pri-
mera esposa Doña Clorinda Pérez y Quiñones, debía esti-
marse como ganancial, y por consiguiente como de la pro-
piedad del otorgante Cartagena y de sus menores hijos Don
José Nicolás, Doña María Mercedes, Don Genaro y Don
José Rafael del Carmen Cartagena y Pérez, habidos en su
matrimonio con su citada difunta esposa; rectificado dicho
error por medio del oportuno juicio divisorio, en el que le
habían sido adjudicados al Don José Nicolás de Cartagena
Mangual, en parte del valor de la participación de referen-
cia. doce mil ciento treinta y tres pesos treinta y tres y un
tercio centavos, y los cinco mil ochocientos sesenta y seis
pesos, sesenta y seis y dos tercios centavos restantes, hasta el
completo de los diez y ocho mil pesos en que había sido
valorada, á sus cuatro hijos los citados Don José Nicolás,
Doña María Mercedes, Don Genaro y Don. José Rafael del
Carmen Cartagena y Pérez, y deseando el expresado Don
José Nicolás de Cartagena y Mangual consolidar el contrato
de compra-venta que anteriormente había celebrado con

the seventh clause the contracting parties declared that the price at which the sale was made was the just and true value "now", (that is to say, on the date of the execution of the deed,) of the interest conveyed; and in clause 8, for the purposes of article 127 of the Motgage Law, the parties also declared that the value of the mortgaged interest was eighteen thousand *pesos*, current money, and waived any new valuation or action leading thereto; they being well aware that this valuation was the one that would serve as a basis for the judicial sale to be held in case of a failure to satisfy the obligation and resort were had to judicial proceedings for the recovery of the money.

José Nicolás de Cartagena had in the deed referred to, committed an error in selling the aforesaid interest in the estate "Ursula" as sole owner thereof, whereas said property having been acquired by him during the life of his first spouse, Clorinda Pérez y Quiñones, it should have been considered as pertaining to the conjugal partnership, and therefore belonging to the contracting party Cartagena and to his minor children José Nicolás, María Mercedes, Genaro and José Rafael del Carmen Cartagena y Pérez, had in wedlock with his aforesaid deceased wife. Said error was corrected through the proper judicial partition, wherein José Nicolás de Cartagena y Mangual had been awarded, as his portion of the value of aforesaid interest, twelve thousand and thirty-three *pesos* and thirty-three and one-third *centavos*, and the remaining five thousand eight hundred and sixty-six *pesos* and sixty-six and two-thirds *centavos*, completing the eighteen thousand *pesos* at which said interest had been valued, to his aforementioned four children, José Nicolás, María Mercedes, Genaro and José Rafael del Carmen Cartagena y Pérez. Then José Nicolás de Cartagena, desiring to consolidate the contract of purchase and sale which he had previously entered into with Juan Serrallés y Colón, of the aforesaid interest in the estate "Ursula", for which purpose he had procured the proper judicial authorization, with

Don Juan Serrallés y Colón sobre la participación expresada de la Hacienda "Úrsula", para lo cual había solicitado y obtenido la autorización judicial correspondiente, en lo que se refería á sus citados hijos menores, por escritura del día 6 de Octubre del mismo año de 1894, otorgada también en Ponce y ante el mismo Notario Don Joaquín Mayoral, el citado Señor Cartagena por sí y en representación de sus expresados hijos menores de edad, ratificó la escritura mencionada de 1º de Septiembre anterior y de nuevo vendió á Don Juan Serrallés y Colón las participaciones que á él y á sus citados hijos correspondían en el condominio que por un diez y ocho por ciento de su total valor les pertenecía en la Hacienda "Úrsula", en precio y cantidad de diez y ocho mil pesos, moneda corriente, de los cuales los doce mil ciento treinta y tres pesos treinta y tres y un tercio centavos, pertenecientes al Don José Nicolás de Cartagena, los percibiría éste á razón de dos mil pesos en cada día 15 de Julio de los años de 1898, 99 y 1900: tres mil pesos en igual día de 1901; otros tres mil pesos en igual día de 1902; y los ciento treinta y tres pesos treinta y tres y un tercio centavos restantes, en igual día del año 1903; y los menores Don José Nicolás, Doña María Mercedes, Don Genaro y Don José Rafael del Carmen Cartagena y Pérez, los cinco mil ochocientos sesenta y seis pesos sesenta y seis y dos tercios centavos, que les correspondían, divisibles entre ellos por cuartas partes, á razón de dos mil ochocientos sesenta y seis pesos sesenta y seis y dos tercios centavos en 15 de Julio del año 1903, y tres mil pesos en igual día de 1904, como se determina en la cláusula 3ª de la referida escritura, estableciéndose en ella también, como en la anterior, "que todos estos pagos se verificarían en moneda corriente en el comercio, sea cual fuere el cuño de la moneda que con tal carácter circule ó esté aceptado en esta Provincia, á razón de cien centavos de la moneda circulante, por cada un peso, y con exclusión de toda clase de papel moneda, creado ó por crear, aún cuando su circulación fuese forzosa"; devengando dichos plazos el interés del diez por ciento anual desde el 23 de

respect to his aforesaid minor children, by deed of October 6, of the same year 1894, likewise executed in Ponce and before the aforesaid Notary Joaquín Mayoral, said Cartagena, in his own right and on behalf of his aforesaid minor children, ratified the above-mentioned deed of September 1, of the previous year, and again sold to Juan Serrallés y Colón the interests belonging to him and to his aforesaid children in the undivided ownership of the estate "Ursula", representing eighteen per cent of the total value thereof, for the sum of eighteen thousand *pesos*, current money, whereof twelve thousand one hundred and thirty-three *pesos* and thirty-three and one-third *centavos*, belonging to José Nicolás de Cartagena, would be paid him at the rate of two thousand *pesos* on the 15th day of July of each of the years 1898, 1899 and 1900; and the five thousand eight hundred and sixty-six *pesos* and sixty-six and two-thirds *centavos* belonging to the minors José Nicolás, María Mercedes, Genaro and José Rafael del Carmen Cartagena y Pérez, to be divided among them in fourth parts, at the rate of two thousand eight hundred and sixty-six *pesos* and sixty-six and two-thirds *centavos* on July 15th, 1903, and three thousand *pesos* on July 15th, 1904, as stipulated in clause 3 of aforesaid deed, wherein, as in the previous one, it was agreed "that all these payments were to be made in current money of commerce, whatever the coinage may be, and of such character as may be circulating or be accepted in this Province, at the rate of one hundred cents of the circulating money for every *peso*, and to the exclusion of all kinds of paper money established, although it may be legal tender"; at the rate of ten per cent. interest per annum from June 23 of the preceding year, payable at the expiration of every quarter; the aforesaid transferred interest in the sugar-estate "Ursula" being also mortgaged as security for payment of the principal and interest agreed upon; with the other clauses and stipulations contained in the previous deed, which are transcribed literally, said document being

Junio anterior, por trimestres vencidos; y quedando también
hipotecado el condominio vendido sobre la Hacienda "Úr-
sula", á la seguridad del pago del capital, y de los intereses
estipulados; con las demás cláusulas y condiciones estable-
cidas en la escritura anterior, que se producen literalmente,
habiendo sido inscrito dicho documento en el Registro de la
Propiedad de Ponce en 6 de Abril del año siguiente.

*Resultando:* que ocurrido posteriormente el fallecimiento
de Don José Nicolás de Cartagena y Mangual, y practi-
cada la división y partición de sus bienes, le fueron adju-
dicados á su segunda esposa Doña Belén Esbrí y Roubert,
en usufructo durante su vida, la suma de mil trescientos
sesenta y cinco pesos; de ellos, doscientos en el resto del
valor de los muebles inventariados, y los mil ciento sesenta
y cinco pesos restantes, en parte de los plazos del crédito
hipotecario que á su difunto esposo correspondía contra Don
Juan Serrallés y Colón, en la forma siguiente: mil treinta y
un pesos, sesenta y seis centavos y dos tercios, del plazo que
vencía en 15 de Julio de 1902; y ciento treinta y tres pesos
treinta y tres centavos y un tercio en el total importe del
plazo, que vence en 15 de Julio de 1903; y que habiendo
reclamado al apoderado de la Sucesión del expresado Se-
rrallés, por haber éste fallecido, Don Eduardo Wellemkamp
y Chelva, los intereses del trimestre vencido en 15 de Sep-
tiembre de 1900, de los plazos que le habían sido adjudi-
cados, montantes dichos intereses á la suma de veinte y
nueve pesos doce centavos en moneda americana, sin des-
cuento, con arreglo á la cláusula segunda de la escritura de
compra-venta de 1? de Septiembre de 1894, como se negara
á pagárselos, sin el descuento establecido, el Sr. Wellemkamp,
lo demandó la expresada Doña Belén Esbrí y Roubert en
juicio verbal civil ante el Juez Municipal de Ponce, que lo
condenó al pago de la cantidad reclamada, en la moneda
americana circulante, sin descuento alguno, por razón de la
diferencia de moneda; é interpuesta apelación por el repre-
sentante de la Sucesión demandada, el Tribunal del Distrito

recorded in the Registry of Property of Ponce on April 6, of the following year.

Then occurred the death of José Nicolás Cartagena y Mangual, and upon the partition of his estate, his second wife, Belén Esbrí y Roubert, was awarded in usufruct during her life, the sum of one thousand three hundred and sixty-five *pesos*; two hundred *pesos* thereof in the remainder of the value of the furniture, as per inventory, and the remaining one thousand one hundred and sixty-five *pesos*, in part of the instalments of the mortgage credit against Juan Serrallés y Colón, accruing to her deceased husband, as follows: one thousand and thirty-one *pesos* and sixty-six and two-thirds *centavos*, of the installment maturing July 14, 1902; and one hundred and thirty-three *pesos* and thirty-three and one-third *centavos*, of the total amount of the installment maturing July 15, 1903; and having demanded of Don Eduardo Wellenkamp y Chelva, as attorney-in-fact of the estate of aforesaid Serrallés, deceased, the interest due for the quarter ending September 15, 1900, on account of the installments that had been awarded her, which interest amounted to twenty-nine dollars and twelve cents, United States currency, without discount, under clause 2 of the deed of purchase and sale of September 1, 1894, as said Wellenkamp refused to pay without making the established discount, said Belén Esbrí y Roubert, brought a verbal civil suit against him before the Municipal Judge of Ponce, who adjudged him to pay the amount claimed, in United States currency, without discount by reason of the difference of money, and the representative of the estate sued having taken on appeal, the District Court of said City affirmed the decision of the Municipal Judge by a majority vote, taxing the costs of both proceedings against appellant.

On April 17 of last year, Libertad Torres Grau Esq., on behalf of Belén Esbri y Roubert, filed in the District Court of Ponce, the complaint which is the beginning of the present suit, against the estate of Juan Serrallés y Colón.

de aquélla Ciudad, con fecha 19 de Enero del año siguiente, confirmó la sentencia del Juez Municipal, por mayoría de votos, con las costas de ambas instancias al apelante.

*Resultando:* que en 17 de Abril del año próximo pasado, el abogado Don Libertad Torres Grau, á nombre de Doña Belén Esbrí y Roubert, entabló ante el Tribunal de Distrito de Ponce, la demanda orígen de este pleito, contra la Sucesión de Don Juan Serrallés y Colón, en la que haciendo relación de algunos de los antecedentes que quedan expuestos, y expresando además, que notificado el demandado Don Eduardo Wellemkamp en la representación con que había comparecido en el juicio, de la sentencia ejecutoria pronunciada por el referido Tribunal de Distrito, hubo de ser requerido más luego para el pago, satisfaciendo al fin el importe del trimestre reclamado, en la moneda americana; y que vencidos ya dos trimestres·más, ó sean los correspondientes al 15 de Diciembre del año anterior de 1900 y 15 de Marzo del siguiente, al reclamar su pago al Sr. Wellemkamp, en su caracter de representante de la Sucesión Serrallés y Colón, se había negado rotundamente á verificarlo, pretendiendo que, tanto las rentas vencidas, como las que vencieran, y el capital, lo había de pagar en la equivalencia de la moneda provincial, y no en la moneda circulante en el comercio, á razón de cien centavos por cada un peso de la citada moneda, á pesar de lo pactado por los contratantes y de lo resuelto por dicho Tribunal de Distrito, en la ejecutoria á que se había referido, sin que hubieran sido atendidas sus reflexiones y gestiones amistosas; por lo que, invocando á su favor las prescripciones legales que creyó del caso, concluyó solicitando que el Tribunal se sirviera admitir dicha demanda en juicio declarativo de mayor cuantía, disponer se diera traslado de ella á la Sucesión de Don Juan Serrallés y Colón, de que era representante Don Eduardo Wellemkamp y Chelva, para que compareciera á contestarla, y en su día declarar que dicha Sucesión, por virtud de lo expresamente pactado en la cláusula segunda de la escritura de compra-venta de 6

After rehearsing therein some of the matters above set forth, and stating further that notice of the executory judgment having been served upon Eduardo Wellenkamp, who had appeared at the trial in representation of the party defendant, he was later required to pay and did finally satisfy in United States currency, the amount of the quarterly payment demanded; but at the expiration of two other quarters, namely, those of December 15, 1900 and March 15, 1901, payment therefor having been demanded of Wellenkamp, in his capacity as representative of the estate of Serrallés y Colón, he positively refused to pay claiming that the interest money, both due and to become due, as well as the principal, should be paid in the equivalent of provincial money, and not in the current money of commerce at the rate of one hundred cents for each *peso* of aforesaid money, notwithstanding what had been stipulated by the contracting parties and decided by said District Court in the aforesaid executory judgment; all his friendly observations and efforts having been disregarded, plaintiff invoked in his favor such legal provisions as were deemed pertinent and closed with a prayer that the Court be pleased to admit the said complaint as a "declaratory action of greater import," and order that notice thereof be served upon the estate of Juan Serrallés y Colón, represented by Eduardo Wellenkamp y Chelva, so that he might appear and answer the same, and that at the proper time judgment be entered declaring that said estate, by virtue of the express stipulation in clause 2 of the deed of purchase and sale of October 6, 1894, executed by Juan Serrallés y Colón and Nicolás Cartagena y Mangual, was bound to pay Belén Esbrí y Roubert the sums of money due up to the date of the complaint, in American gold, which was the current money of commerce in the Island; and that those yet to fall due, as also the part of the installments maturing in 1902 and 1903, among those stipulated in said deed, that had been awarded to her in the partition of the property left by her aforesaid husband, be in due time paid in the current

de Octubre de 1894, entre Don Juan Serrallés y Colón y Don Nicolás Cartagena y Mangual, estaba obligada á pagar á Doña Belén Esbrí y Roubert las rentas vencidas hasta la fecha de la demanda, en oro americano, que era la moneda circulante en el comercio de esta Isla; y en su oportunidad las que estaban por vencer, así como la parte de los plazos que le correspondían, vencederos en 1902 y 1903, de los estipulados en dicha escritura, y que le fué adjudicada en la divisoria de los bienes dejados por su citado esposo, en moneda corriente en el comercio, sea cual fuere el cuño de la moneda que con tal carácter circule ó esté aceptada en esta Isla, á razón de cien centavos de la moneda circulante por cada un peso; los intereses legales de los ya vencidos y no pagados y las costas del juicio, suscribiendo dicha demanda "por el compañero", el Lcdo. Don Rafael Toro Vendrell.

*Resultando:* que conferido traslado de la demanda á la Sucesión de Don Juan Serrallés y Colón, y citado y emplazado en su carácter de representante de la misma, Don Eduardo Wellemkamp y Chelva, se personó éste en los autos por conducto del abogado Don Julio M. Padilla, alegando las excepciones dilatorias de falta de personalidad en el representante del áctor, por no venir autorizado el escrito de demanda por el abogado que llevaba la representación de la demandante, sino por otro en nombre de aquél, para cuya sustitucion no estaba autorizado; y la de falta de personalidad en el demandado, por no tener el Sr. Wellemkamp la representación que se le atribuía, toda vez que, si bien era apoderado de Doña Mercedes Perez, viuda de Don Juan Serrallés y Colón, por sí y en representación de sus hijos menores Don Juan Eugenio y Doña Julia Serrallés, habiendo éstos arribado á la mayor edad, carecía de poder para representarlos en el juicio; y exponiendo además, en cuanto al fondo de la demanda, entre otros particulares, que la Sucesión de Don Juan Serrallés nunca se había negado á pagar en la equivalencia de moneda; que la escritura de 6 de Octubre de 1894, no era la primordial del contrato, pues

money of commerce, whatever be the coinage of the money then circulating or admitted as such in this Island, at the rate of one hundred cents of the money in circulation for every *peso;* the legal interest on the installments due and not paid, and the costs of the trial.    Said complaint was signed by Rafael Toro Vendrell Esq., "on behalf of the colleague".

Notice of the complaint was served upon the estate of Juan Serrallés y Colón and Eduardo Wellenkamp y Chelva being cited in his capacity as representative of said estate, he entered an appearance through Julio M. Padilla Esq., who alleged the dilatory exception of want of capacity on the part of the plaintiff's representative to sue, the complaint not being subscribed by the attorney representing the plaintiff, but by another in his name, which substitution was not authorized, and that of want of capacity of the defendant, inasmuch as Wellenkamp had not the authority attributed to him, because although he was the attorney-in-fact of Mercedes Pérez, widow of Juan Serrallés y Colón, in her own right and on behalf of her infant children Juan Eugenio and Julia Serrallés, as the latter had already attained their majority he had no power to represent them in the trial of the case.   And as to the essential part of the complaint he further alleged, among other things, that the estate of Juan Serrallés had never refused to pay the equivalent of the money; that the deed of October 6, 1894, was not the original one of the contract, it having been executed for the purpose of correcting the deed of September 1 of the same year; that in both deeds the controverted clause read: "that all the payments were to be made in current money of commerce, whatever might be the character of the money, at the rate of one hundred cents of the money in circulation for each *peso,* and to the exclusion etc."; that on October 6, 1894, when the second contract was executed, in which the aforesaid clause was repeated, Mexican money was circulating in Porto Rico, and the withdrawal and exchange thereof had been officially announced; that, in fact, the

se había otorgado para rectificar la de 1º de Setiembre del mismo año: que en una y otra escritura, la cláusula cuestionable decía, "que todos los pagos se harían en la moneda corriente en el comercio, sea cual fuere el cuño de la moneda que con tal carácter circule, ó esté aceptado en esta provincia, á razón de cien centavos de la moneda circulante por cada un peso, y con exclusión, etc.": que en 6 de Octubre de 1894, cuando se otorgó el contrato segundo, en que la repetida cláusula se contenía, circulaba en Puerto Rico la moneda mejicana cuya recogida y canje ya estaban oficialmente anunciados; que en efecto, la Ley de Presupuestos de 6 de Agosto de 1893, para el ejercicio de 1893-1894, autorizaba la sustitución de la plata mejicana por plata peninsular: que el Real Decreto de 17 de Agosto de 1895, creó un billete de canje á los fines de la recogida, y sustitución de esa moneda; otro de la misma fecha, autorizó la celebración sin subasta de los contratos ó servicios que exigía dicha medida; que las Reales Órdenes de igual fecha, de 11 de Setiembre, de 28 de Octubre y de 28 de Noviembre, adoptaron varias disposiciones para preparar y facilitar las operaciones de tales recogida y cange; que el Real Decreto de 6 de Diciembre, declaró desmonetizados los pesos mejicanos y creó en sustitución el peso especial de cuño español: que el Gobierno General de Puerto Rico, de 20 de Marzo de 1896, retiró de la circulación la moneda española que antes corría, y que en el mismo año quedó tambien verificado el canje de la mejicana: que la Sucesión de Serrallés había satisfecho en moneda provincial, sin descuento, hasta el 15 de Julio de 1900, las rentas debidas en moneda mejicana á Doña Belen Esbrí: que esta Isla fué provincia española hasta el 11 de Abril de 1899, en que fué cedida al Gobierno Americano, el que ha formado de ella otra entidad política diferente, que se denomina "El Pueblo de Puerto Rico," según Ley del Congreso, aprobada en 12 de Abril de 1900: que en 31 de Julio del mismo año, había quedado definitivamente retirada de la circulación, la moneda especial, mediante canje por la americana al tipo de sesenta centavos de ésta por cada

law of appropiations, approved August 6, 1893, for the fiscal year 1893-1894, authorized the exchange of Mexican silver for Spanish silver; that the Royal Decree of August 17, 1895, created an exchange note for the purposes of the withdrawal and exchange of said money; that another (Decree) of the same date, authorized that the contracts or services demanded by said measure be let out, without a public call for bids; that by Royal Orders of the same date, and of September 11, October 28 and November 28, various provisions were approved for the purpose of preparing and facilitating the operations of said withdrawal and exchange; that by Royal Decree of December 6, Mexican *pesos* were declared to be demonetized and in place thereof a special *peso*, bearing the Spanish stamp, was created; that the General Government of Porto Rico, on March 20, 1896, withdrew the Spanish money which was formerly in circulation, and that the exchange of Mexican silver was also brought about the same year; that the estate of Serrallés had paid in Provincial money, without discount, the rents due Belén Esbri in Mexican money up to July 15, 1900; that this Island had been a Spanish Province until April 11, 1899, when it was ceded to the American Government which made of it a different body politic, under the title of "The People of Porto Rico", pursuant to an Act of Congress, approved April 12, 1900; that on July 31, of the same year, the special money had been definitively withdrawn from circulation, through an exchange for the United States money at the rate of sixty cents of the latter for one hundred cents of the former; and that the exact price and valuation of the property, in case of a public sale, had been fixed in clauses 3 and 8 of the deed of Obtober 6, 1894, and the corresponding clauses 7 and 8, of that of September 1, of the same year, at eighteen thousand *pesos* of the money then in circulation; and deducing from all these facts such legal considerations as were pertinent to his claims, counsel for Wellenkamp prayed that he be consi-

cien de aquélla: y que las cláusulas tercera y octava de la escritura de 6 de Octubre de 1894, y sus concordantes séptima y octava, de la de 1? de Setiembre del mismo año, determinan el justo precio de la finca, y su avalúo, en caso de subasta, en diez y ocho mil pesos de la moneda entonces corriente; y deduciendo de todos estos antecedentes las consideraciones legales que estimó pertinentes á su derecho, concluyó pidiendo el abogado director del Sr. Wellemkamp, que habiéndole por personado en tiempo y forma en nombre de dicho señor, y teniendo por alegadas las excepciones de falta de personalidad en el representante del actor y en el demandado, y por contestada la demanda, se sirviera él Tribunal, al entrar en el juicio, declarar con lugar aquéllas, y en definitiva absolverle de ésta, imponiendo al actor perpetuo silencio y todas las costas.

*Resultando:* que recibido el pleito á pruebas y admitidas las propuestas por las partes, entre ellas las de documentos, testigos y presunciones, se trajeron y agregaron á los autos el expediente original del juicio verbal civil, seguido en el Juzgado Municipal de Ponce por Doña Belén Esbrí y Roubert contra la Sucesión de Don Juan Serrallés, en cobro de veinte y nueve pesos doce centavos, por intereses de un trimestre de los mil ciento sesenta y cinco pesos del crédito hipotecario que le correspondía sobre la participación de la Hacienda "Ursula", que le había vendido al difunto Serrallés, el esposo de la demante Don José Nicolás de Cartagena y Mangual, y las dos escrituras de 1? de Septiembre y 6 de Octubre de 1894, origen del crédito hipotecario de referencia.

*Resultando:* que abierto el juicio oral y desestimadas las excepciones dilatorias opuestas por la representación de Don Eduardo Wellemkamp, sobre falta de personalidad en el representante del actor y del mismo demandado, por no tener el carácter con que se le demandaba, contra cuyas resoluciones protestó el abogado defensor del Sr. Wellemkamp y así se consignó, á los efectos del recurso de casación, continuó el juicio respecto á la cuestión principal, recibiéndose las decla-

dered as having in due time and manner entered an appearance on behalf of his client, and that the exceptions alleging the lack of capacity of both plaintiff and defendant as having been entered and the complaint as having been answered, and that the Court be pleased, upon the trial, to sustain the former and finally dismiss the latter, imposing "perpetual silence" and all the costs upon the plaintiff.

The evidence in the case having been ordered to be taken and such as was offered by the parties, including documentary, oral and presumptive evidence, being admitted, there were brought and added to the record the original papers of the civil oral action, prosecuted in the Municipal Court of Ponce by Belén Esbri y Roubert against the estate of Juan Serrallés, to recover twenty-nine *pesos* and twelve *centavos*, being three months interest on the one thousand one hundred and sixty-five *pesos* of the mortgage credit appertaining to her from the share in the estate "Ursula" which had been sold to the late Serrallés by the plaintiff's husband, José Nicolás Cartagena y Mangual, and the two deeds of September 1 and October 6, 1894, which gave rise to the aforesaid mortgage credit.

The case having come on to he heard, the Court overruled the dilatory exceptions alleging lack of capacity of the plaintiff's representative and of the defendant himself, taken by counsel for Eduardo Wellenkamp, against which rulings the latter protested, said protest being entered for the purposes of an appeal in cassation. The trial, then, was proceeded with as to the main issue, the testimony of the witnesses Guillermo Schuck, Francisco Paraccini and Antonio Catinchi being taken, the two first-mentioned being merchants, and the last a business agent, all of legal age. To questions put by counsel for Wellenkamp the first witness testified that he knew that transactions effected in business with documents similar to those giving rise to this action, had all been consummated upon the basis of the

raciones de los testigos Don Guillermo Schuk, Don Francisco Paraccini y Don Antonio Catinchi, los dos primeros, comerciantes, y el último, agente de negocios, y todos mayores de edad; de los cuales el primero declaró á preguntas del abogado defensor del Sr. Wellemkamp, que sabía que las operaciones realizadas en el comercio con documentos parecidos al que motivaba este asunto, se habían hecho todas por la equivalencia; y á preguntas del abogado contrario, que ignoraba en qué forma se hubieran hecho las operaciones en documentos en que se consignara la cláusula que se discutía en el presente caso; el segundo, que las operaciones en el comercio se habían hecho por la equivalencia, y que los documentos que tenía el declarante no contenían la cláusula citada; y el tercero, que en los documentos en que había intervenido, con cláusulas parecidas á la que se discutía, aunque no tan concretas, se habían realizado las operaciones por la equivalencia.

*Resultando:* que terminado el juicio oral, dictó sentencia, por mayoría de votos, el Tribunal del Distrito de Ponce, en 17 de Septiembre del año próximo pasado, por la que, declarándose con lugar la demanda, se declaró también que la Sucesión de Don Juan Serrallés y Colón estaba obligada á pagar á Doña Belén Esbrí y Roubert, viuda de Don Nicolás Cartagena y Mangual, la renta vencida hasta la fecha, procedente del contrato de compra-venta celebrado entre Cartagena y Serrallés, en 6 de Octubre de 1894, en moneda americana, que era la circulante en el comercio de esta Isla; y que en su oportunidad, las rentas que habían de vencer, así como la parte de los plazos que le correspondían por virtud del mismo contrato, vencederos en los años de 1902 y 1903, y que le fueron adjudicados en la divisoria de los bienes dejados por su citado esposo Sr. Cartagena, se pagarán en la moneda corriente en el comercio, sea cual fuere el cuño de la moneda que con tal carácter circule, ó esté aceptada en esta Isla, á razón de cien centavos de la moneda circulante, por cada un peso; condenándose, además, á la Sucesión deman-

equivalent monetary value thereof; and to questions put by counsel for the opposition he replied that he did not know in what manner the transactions would have been made in case of documents containing the clause that was now being discussed. The second witness testified that such transactions in business had been made upon the basis of the equivalent and that the documents held by him did not contain the aforesaid clause. And the third witness testified that the transactions in documents containing clauses similar to those under discussion, in which he had intervened, though not so specific, had been effected for their equivalent.

Upon the termination of the hearing the District Court of Ponce, by a majority vote, rendered judgment on September 17, of last year, sustaining the complaint and holding that the estate of Juan Serrallés y Colón was bound to pay Belén Esbrí y Roubert, widow of Nicolás Cartagena y Mangual, the income matured up to date, under the contract entered into between Cartagena and Serrallés on October 6, 1894, in American money which was the medium in circulation in the Island; and the income yet to mature, as well as the portion of the intallments belonging to her by reason of said contract, to mature in the years 1902 and 1903, and that had been awarded to her upon the partition of the property left by her aforesaid husband, Cartagena, were in due time to be paid in current money of commerce whatever might be the coinage of the money circulating or accepted as such in this Island, at the rate of one hundred cents of the money in circulation for every *peso*. The estate of Serrallés was furthermore adjudged to pay the interest on the income which was due and unpaid and the costs of the proceedings.

An explanation of this judgment having been requested by counsel for Eduardo Wellenkamp, in order to determine whether the obligation declared therein was to pay an American dollar for each Provincial or Mexican *peso*, or to

dada al pago de los intereses de las rentas vencidas y no satisfechas, y al de las costas.

*Resultando :* que pedida aclaración de esta sentencia por el Abogado defensor de Don Eduardo Wellemkamp, para que se determinara si la obligación declarada en aquélla, era la de pagar peso americano por peso provincial ó mejicano, ó si era la de pagar en la primera de dichas menedas, con el descuento oficial ; y declarado por el Tribunal, por auto de 13 de Noviembre del mismo año, no haber lugar á la aclaración que se solicitaba, toda vez que la sentencia dictada expresaba claramente que la Sucesión Serrallés había de ·pagar á Doña Belén Esbrí las rentas é intereses vencidos y por vencer, en pesos americanos, sin descuento de ninguna especie, respecto á la moneda anterior circulante cuando se había otorgado el contrato, se interpuso por la representación de Don Eduardo Wellemkamp, contra la expresada sentencia, recurso de casación por quebrantamiento de forma, y simultáneamente por infracción de ley, que le fué admitido; y elevados los autos á este Tribunal Supremo, con citación y emplazamiento de las partes, comparecidas éstas, se entregaron los autos al Abogado defensor del recurrente, quien los devolvió desistiendo del recurso de quebrantamiento de forma, y formalizando el de infracción de ley, como comprendido en los números 1 y 7 del artículo 1690 de la Ley de Enjuiciamiento Civil, y alegando como fundamentos del mismo, los siguientes :

I.   Infracción de los artículos 1091, 1256 y 1258 del Código Civil. El contexto literal de las cláusulas segunda y tercera respectivamente, de las escrituras de 1º de Septiembre y 6 de Octubre de 1894, demuestra hasta la suma evidencia que la voluntad de los contratantes Señores Cartagena y Serrallés, fué fijar al condominio vendido por el primero al segundo, el precio de diez y ocho mil pesos, de la moneda corriente en el país en la fecha del contrato. Esta fué la base capital del contrato. Abocado como se hallaba entonces el canje de la moneda mejicana por la especial, era lógico se previese en el mismo contrato, el quebranto del cinco por ciento que había de sufrir la primera. En su consecuencia se estipuló lo preciso para que no disminuyese el importe del precio, que debía ser necesariamente el de diez y ocho mil pesos de la moneda comercial corriente en Septiembre de 1894, pero

pay in the former of aforesaid coins, at the official rate of exchange, the Court by an order dated November 13 of the same year, declared that the explanation requested would not be made, inasmuch as in the judgment rendered it was clearly stated that the estate of Serrallés had to pay Belén Esbrí the rents and interest due and to become due, in American dollars, whithout discount of any kind on account of the difference in the money in circulation at the time the contract was executed. Thereupon the representative of Eduardo Wellenkamp took an appeal in cassation from aforesaid judgment for error of procedure and also for error of law, which being allowed, the record was forwarded to this Supreme Court and the parties cited; and the parties having appeared said record was delivered to counsel for appellant who upon returning the same withdrew his appeal for error of procedure and perfected the appeal for violation of law, as coming under paragraphs 1 and 7 of Article 1690 of the Law of Civil Procedure, and alleging the following grounds:

I.   Violation of articles 1091, 1256 and 1258 of the Civil Code.   The literal text of clauses 2 and 3, respectively, of the deeds of September 1st and October 6th, 1894, clearly shows that it was the purpose of the contracting parties, Cartagena and Serrallés, to fix the price of the interest sold by the former to the latter, at eighteen thousand *pesos,* in the currency of the country at the time of the contract.   This was the principal basis of the contract.   The exchange of the Mexican coin for the provincial money, being then about to take place, it was logical that the loss of five per cent should be taken into account in the contract.   The necessary stipulation was therefore made in order to prevent any reduction in the purchase price, which was to be neither more nor less than eighteen thousand *pesos* of the commercial money in circulation in September 1894.   The judgment therefore violates articles 1091, 1256 and 1258 of the Civil Code, which strictly determine the scope of obligations and contracts, in accordance with the stipulations agreed upon by the contracting parties.

II.   Violation of articles 1445, 1449 and 1500 of the Civil Code.   One of the essential requisites for the existence of a contract of purchase and sale, is that the price should be definitely determined; the determination of the price can never be left to the judgment of one of the contracting parties

nunca ménos, como tampoco más cantidad. La sentencia pues, infringe los artículos 1091, 1256 y 1258 del Código Civil, que determinan el estricto alcance de las obligaciones y contratos, con arreglo á los términos fijados por los contratantes.

II. Infracción de los artículos 1445, 1449 y 1500 del Código Civil. Uno de los requisitos esenciales para la existencia del contrato de compra-venta es el de que el precio sea cierto ; cuyo señalamiento no puede dejarse al arbitrio de uno de los contratantes, siendo la obligación del comprador pagar el que se haya convenido, como así lo previenen los artículos de que se deja hecho mérito.

La sentencia recurrida altera sustancialmente el valor de la cosa vendida, atribuyéndole un precio que excede en más de la tercera parte del justo valor de diez y ocho mil pesos de la moneda circulante entonces en la Isla y que fué el convenido por el comprador y el vendedor, pues el peso comercial de aquella época tiene un valor igual, calculados sus cien centavos, á sesenta centavos de la moneda americana hoy circulante. De suerte que, siendo el valor real intrínseco, el comercial y aún el legal de los diez y ocho mil pesos de moneda de Puerto Rico, tan sólo en su equivalente de oro americano, el de diez mil ochocientos dollars, el fallo del Tribunal de Ponce lo aumenta caprichosamente en siete mil doscientos dollars más, con gravísimo perjuicio del comprador y con infracción de los preceptos legales que determinan la certeza del precio en el contrato de compra-venta.

III. Infracción de la Sección 11ª de la "Ley Orgánica para proveer temporalmente de rentas y un Gobierno Civil á la Isla de Puerto Rico y para otros fines", votada y aprobada por el Congreso de los Estados Unidos en 12 de Abril de 1900.

Dicha Sección 11ª dispone de un modo absoluto é imperativo, "que todas las deudas pendientes al empezar á regir dicha ley, serán pagaderas en la moneda de Puerto Rico, actualmente en circulación, ó en moneda de los Estados Unidos al tipo de sesenta centavos moneda acuñada de los Estados Unidos por cada peso de cuño puertorriqueño." Resulta, pues, evidente, la infracción de dicha ley por el fallo del Tribunal de Ponce.

IV. Infracción de los artículos, 1281, 1283, 1284 y 1289 del Código Civil, que se refieren á la interpretación de los contratos. El Tribunal de Ponce, apartándose de los términos claros del contrato de compra-venta, del que resulta haberse fijado el precio de la cosa vendida en diez y ocho mil pesos de la moneda comercial corriente en Puerto Rico en Septiembre y Octubre de 1894, entra á juzgar la intención de los contratantes, infringiendo así el artículo 1281 del Código Civil. La sentencia infringe además el artículo 1283 del mismo Código, porque el criterio de interpretación que la informa establece circunstancias del contrato, distintas á las que los contratantes se propusieron estipular y estipularon. Infringe también el artículo

the vendee being obliged to pay only the price stipulated, as provided in aforesaid articles.

The judgment appealed from substantially alters the value of the property sold, by placing upon it a value one third in excess of the just price of eighteen thousand *pesos* of the money then current in the Island, which was the one agreed upon between vendor and vendee, inasmuch as the commercial *peso* in circulation at that time was only equivalent to sixty cents of the American money which is now the circulating medium.   Thus then, the actual intrinsic, as well as commercial and legal value of the eighteen thousand *pesos* of Porto Rican money, being equivalent only to ten thousand eight hundred dollars, the judgment of the Ponce Court capriciously increases it by seven thousand dollars, thereby greatly prejudicing the interests of the vendee, and in violation of the legal provisions requiring that the price stipulated in the contract of purchase and sale shall be definitly determined.

III.   Violation of section 11 of the "Organic Act, temporarily to provide revenues and a Civil Government for Porto Rico, and for other purposes", passed and approved by the Congress of the United States, April 12, 1900. Said section 11 provides in an absolute and imperative manner, "that all debts owing on the date when this Act shall take effect, shall be payable in the coins of Porto Rico, now in circulation, or in the coins of the United States at the rate of exchange of sixty cents United States coins for each *peso* of Porto Rico coin".   It is then evident that said law has been violated by the judgment of the Ponce Court.

IV.   Violation of articles 1281, 1283, 1284 and 1289 of the Civil Code, referring to interpretation of contracts.   The Ponce Court, ignoring the clear terms of the contract of purchase and sale, from which it is seen that the price of the property sold had been fixed at eighteen thousand *pesos*, commercial money circulating in Porto Rico in September and October of 1894 proceeds to construe the intention of the contracting parties, thereby violating article 1281 of the Civil Code.   The judgment, moreover, violates article 1283 of the same Code, because in the method of interpretation followed, circumstances of the contract are established different from those with regard to which the persons interested intended to contract.   It also violates article 1284, because it is unreasonable to suppose that Juan Serrallés y Colón, proposed to contract the obligation to pay for the property purchased, a price considerably above the one he had recognized it to be worth. It likewise violates article 1289, because nothing can be more opposed to the reciprocity of interests of both contracting parties, than to increase, for the benefit of the vendor, the price of the property sold, by seven thousand two

1284, porque nada más inadecuado como suponer que Don Juan Serrallés y Colón se propusiera contraer la obligación de satisfacer por la cosa comprada, un precio muchísimo mayor que el que en realidad reconoció á aquélla. Infringe asimismo el artículo 1289, porque nada más opuesto á la reciprocidad de intereses de ambos contratantes, como aumentar, en beneficio del vendedor, el precio de la cosa vendida, en siete mil doscientos dollars, mientras que la cosa objeto del contrato no ha recibido mejora alguna que justifique ese criterio de interpretación.

V.    Infracción, por aplicación indebida, de los artículos 1116, 1125, 1261, 1278 y 1285 del Código Civil.

El artículo 1116 está mal citado é indebidamente aplicado al fallo de que se trata, porque se refiere á condiciones imposibles, que no existen en el contrato.

El 1125 lo está también, porque se refiere al día cierto en que son exigibles las obligaciones, y en este caso no existe mora en el pago de la cantidad justamente estipulada como precio.

El 1261 lo está igualmente, porque supone la sentencia que la obligación contraída por Don Juan Serrallés le constriñe á pagar cien centavos de moneda de cuño americano por cien centavos de moneda de Puerto Rico.

El 1278 lo está así mismo, por iguales razones que el 1261. Y el 1285 ha sido también mal aplicado porque si, como en él se previene, las cláusulas de un contrato deben interpretarse las unas por las otras, es grave error resolver que diez y ocho mil pesos de la moneda puertorriqueña, deben pagarse por diez y ocho mil pesos de moneda de los Estados Unidos, que equivalen á treinta mil pesos de la moneda en que se estipuló el precio; sobre todo, cuando en las mismas cláusulas de ambas escrituras de 1.º de Septiembre y 6 de Octubre de 1894, se estipula que el precio de la compra-venta es el de diez y ocho mil pesos de la moneda puertorriqueña; y

VI.    Los precedentes errores de derecho han originado el error en la apreciación de los documentos que en concepto de prueba fueron presentados por las partes, procediéndose á considerarlos, prescindiendo de la legalidad vigente en el punto controvertido, cual es la establecida por la Ley Orgánica de 12 de Abril de 1900.

*Resultando :* que sustanciado el recurso por todos sus trámites, se señaló día para la vista, á cuyo acto concurrieron los abogados defensores de las partes, quienes sostuvieron sus respectivas conclusiones.

Abogado del recurrente : Sr. *Guzmán Benítez (José)*

Abogado del recurrido: Sr. *Diaz Navarro.*

EL JUEZ PRESIDENTE SR. QUIÑONES, después de exponer los hechos anteriores, emitió la siguiente opinión del Tribunal :

hundred dollars, while said property, the object of the contract, has not received any improvement justifying such an interpretation.

V. Violation by undue application of articles 1116, 1125, 1261, 1278 and 1285 of the Civil Code.

Article 1116 is improperly cited and unduly applied in the judgment, because it refers to impossible conditions which do not exist in the contract.

The same is true as to article 1125, because it refers to obligations the fulfillment of which has been fixed for a certain day, and in this case there exists no delay in the payment of the price certain, agreed upon.

Article 1261 has also been misapplied, because the judgment entered assumes that the obligation contracted by Juan Serrallés binds him to pay one hundred cents of the money of the United States for one hundred cents of the money of Porto Rico.

For the same reasons article 1278 has also been misapplied, and likewise article 1285, because if, as stated therein, the stipulations of a contract should be interpreted in relation one to the other, it is a serious error to hold that eighteen thousand *pesos*, Porto Rican money, must be paid with eighteen thousand dollars, United States currency, which is equivalent to thirty thousand *pesos* of the money in which the price was stipulated; especially when it is agreed in the same clauses of both deeds, dated respectively September 1 and October 6, 1894, that the price of the sale is eigtheen thousand *pesos* of Porto Rican money; and

VI.—The foregoing errors of law have given rise to the error in the consideration of the documents introduced as evidence by the parties, which were passed upon without regard to the legislation in force, governing the point at issue, namely, that established by the Organic Act of April 12, 1900.

The appeal having been pursued through all its stages, a day was set for the hearing, when counsel for both parties appeared and made their arguments.

Mr. *Guzmán Benítez (José)*, for apellant.

Mr. *Díaz Navarro*, for respondent.

Mr. CHIEF JUSTICE QUIÑONES, after making the above statement of facts, rendered the opinion of the Court.

Under paragraph 9, article 1727 of the Law of Civil Procedure, an appeal in cassation for violation of law is not admissible when based upon the consideration of the evi-

*Considerando:* que con arreglo al art. 1727 de la Ley de Enjuiciamiento Civil, en su número 9?, el recurso de casación por infracción de ley no es admisible cuando se interpone contra la apreciación de las pruebas, hecha por la Sala sentenciadora, á ménos que el caso esté comprendido en el número 7? del artículo 1690 de la misma Ley; es decir, cuando en la apreciación de las pruebas haya incurrido la Sala sentenciadora en algún error de hecho ó de derecho, en cuyo caso, según la Jurisprudencia establecida por el Tribunal Supremo de España, y constantemente seguida por este Tribunal, es indispensable que en el escrito interponiendo el recurso se exprese claramente si el error cometido por la Sala es de hecho ó de derecho, expresando en el primer caso, el acto ó documento auténtico que demuestre la equivocación evidente del juzgador; y en el segundo, la ley ó doctrina legal relativa al valor de las pruebas, que haya sido infringida; sin cuyo requisito no puede entenderse bien planteado el problema jurídico que se somete á la resolución del Tribunal y no procede admitir el recurso.

*Considerando:* que no habiendo sido impugnada la apreciación de las pruebas hecha por la Sala sentenciadora en la forma que la Ley requiere, puesto que si bien en el sexto y último motivo del recurso se manifiesta que se había incurrido en error en la apreciación de los documentos que en concepto de prueba fueron presentados por las partes, procediéndose á considerarlos, prescindiendo de la legalidad vigente en el punto controvertido, cual era la establecida por la Ley Orgánica de 12 de Abril de 1900, ni se expresa qué clase de error es el cometido por el Tribunal sentenciador, ni aunque se admita que fuera el de derecho, no se cita la ley ó doctrina legal que haya sido infringida, relativa al valor de los medios de prueba, pues la Ley Orgánica de 12 de Abril de 1900, que como tal se menciona por el recurrente, es una ley sustantiva, que en nada se refiere al valor de las pruebas procesales, no procede admitir el recurso

dence on the part of the trial court, unless included in the provision of subdivision 7 of article 1690 of said law; that is to say, when in the consideration of evidence an error of law or of fact has been committed by the trial Court, in which case according to the jurisprudence established by the Supreme Court of Spain and constantly followed by this Court, it is necessary that in the petition interposing the appeal, it should be clearly stated whether the error committed was of fact or of law, setting forth in the first case, the act or authentic document which shows the evident error of the judge, and in the second case, the law or legal doctrine relating to the value of the evidence, alleged to have been violated; without which requisite the legal point submitted for the decision of the Court cannot be considered as having been properly presented and the appeal is not admissible.

The consideration of the evidence by the trial court, has not been opposed in the manner required by law; for although in the sixth and last ground of the appeal it is claimed that an error had been committed in the consideration of the documents introduced in evidence by the parties, said documents being passed upon regardless of the legislation in force governing the point at issue, namely, that established by the Organic Act of April 12, 1900, what kind of error was committed by the lower court is not stated, and even admitting that it was an error of law, no mention is made of the law or legal doctrine alleged to have been violated, bearing upon the matter of evidence, inasmuch as the Organic Act, of April 12, 1900, mentioned as such by appellant, is a substantive law, having nothing to do with the evidence presented at a trial, for which reason the appeal as based on subdivision 7, article 1690 of the Law of Civil Procedure, cannot be sustained.

The meaning of the third clause of the deed of sale, dated October 6, 1894, having been interpreted by the lower court in its literal sense and to the full extent and

en cuanto se funda en el número 7º del Art. 1690 de la Ley de Enjuiciamiento Civil.

*Considerando:* que fijada por el Tribunal sentenciador la inteligencia de la cláusula 3ª de la escritura de compraventa de 6 de Octubre de 1894, en su sentido literal y en toda la extensión y generalidad de los términos en que aparece redactada, como expresión clara y explícita de la voluntad de las partes, al condenar, en su consecuencia, á la Sucesión de Don Juan Serrallés á su extricto cumplimiento, no infringe, antes al contrario, aplica rectamente los artículos 1091, 1256 y 1258 del Código Civil, que se citan como infringidos en el primer motivo del recurso, y que consagran la fuerza y eficacia de las obligaciones, y someten á las partes el cumplimiento de las mismas, con todas sus consecuencias; ni los artículos 1445, 1449 y 1500 del mismo Código, que se citan en el segundo motivo, y que requieren para la perfección del contrato de compra-venta, la estipulación de un precio cierto, que ha de ser pagado por el comprador en el tiempo y lugar fijados por el contrato, requisito que ha sido cumplido al fijarse en el contrato de compraventa de que se trata, como precio cierto de la venta hecha por Don José Nicolás de Cartagena á Don Juan Serrallés y Colón, del condominio que le correspondía á él y á sus hijos menores de edad, sobre la Hacienda "Ursula", en la suma de diez y ocho mil pesos, de la moneda corriente en el comercio á la fecha de la celebración del contrato, y que no puede estimarse desvirtuado por la condición establecida, y mutuamente aceptada por las partes, para regular el pago de los plazos pendientes, en relación al valor de la moneda circulante á sus respectivos vencimientos, que no por ser de naturaleza aleatoria, deja de ser perfectamente lícita y admisible en el contrato de compra-venta, con arreglo á las prescripciones de los artículos 1115 y 1255 del mismo Código.

*Considerando:* en cuanto á la Sección 11ª de la Ley Orgánica de 12 de Abril de 1900, que también se supone infringida por la sentencia en el tercer motivo del recurso,

scope of the wording thereof, as a clear and explicit expression of the will of the contracting parties, in holding under said construction the estate of Juan Serrallés to a strict compliance therewith, does not violate, but on the contrary, correctly applies articles 1091, 1256 and 1258 of the Civil Code, that are cited as having been violated in the first ground of the appeal and which articles define the force and efficacy of obligations and bind the parties to the fulfilment thereof, with all the attending consequences; nor articles 1445, 1449 and 1500, of the same Code, cited in the second ground, and which require for the perfection of a contract of purchase and sale the stipulation of a certain price to be paid by the vendee at a time and place specified in the contract, a requisite which was complied with by fixing in the contract of purchase and sale now under discussion, as a certain price of the sale made by José Nicolás de Cartagena to Juan Serrallés y Colón, of his interest and that of his minor children in the estate "Ursula", the sum of eighteen thousand *pesos*, commercial money in circulation on the date the contract was entered into, and it cannot be considered as invalidated by virtue of the condition established and mutually accepted by the parties for regulating the payment of pending instalments, according to the value of the money in circulation at the time of their respective maturity, which condition, though aleatory in its nature, is perfectly legitimate and permissible in a contract of purchase and sale, under the provisions of articles 1115 and 1255 of aforesaid Code.

As to Section 11 of the Organic Act, also alleged to have been violated by the judgment, in the third ground of the appeal, although said Section provides that all debts owing on the date the Act takes effect, shall be payable in the coins of Porto Rico then in circulation, or in the coins of the United States at the established rate of exchange, that is to say, sixty cents United States coins, for every *peso* of Porto Rican money, this provision should be understood

que si bien dicha sección dispone que todas las deudas pendientes al empezar á regir la expresada Ley, serían pagaderas en la moneda de Puerto Rico que circulaba en aquella fecha; ó en moneda de los Estados Unidos, al tipo del cambio establecido, ó sea á razón de sesenta centavos moneda acuñada de los Estados Unidos, por peso de cuño puertorriqueño, esta disposición debe entenderse sin perjuicio de los derechos adquiridos por virtud de contratos anteriores, en que las partes hubieren convenido una manera distinta de realizar el pago de sus obligaciones, en relación á los cambios que pudieran operarse en el valor de la moneda, y bajo el amparo de las leyes que los regulaban y regían á la fecha en que fueron celebrados; pues siendo un principio de derecho inconcuso y proclamado tanto por la legislación Americana, como por la vigente en esta Isla, que las leyes no tienen efecto retroactivo, no ha podido ser el ánimo del Congreso de los Estados Unidos derogar esos contratos, que á mayor abundamiento, amparaba también el artículo 8 del Tratado de París; y por consiguiente, al condenarse por la sentencia recurrida á la Sucesión Serrallés al pago de las cantidades que le reclama la demandante Doña Belén Esbrí, en la forma que determina la cláusula 3ª de la escritura de 6 de Octubre de 1894, no ha infringido la citada disposición legal, y tampoco procede admitirse el recurso por ese otro motivo.

*Considerando:* que tampoco infringe la sentencia las reglas de interpretación de los contratos, contenidas en los artículos 1281, 1283, 1284 y 1289 del Código Civil, porque siendo claros los términos en que aparece redactada la cláusula 3ª del contrato de compra-venta de 6 de Octubre de 1894, y no ofreciendo duda sobre la intención de las partes contratantes, el Tribunal de Ponce se ha limitado á aplicarla en su sentido literal, precisamente como lo ordena el primero de los artículos citados; no habiendo sido tampoco infringido el segundo, ó sea el 1283, porque si el Tribunal sentenciador ha estimado, en vista de los documentos y demás

without prejudice to rights acquired by virtue of previous contracts in which the parties have agreed upon a different manner of satisfying their obligations, with respect to the changes that might be brought about in the value of the circulating medium, and under the protection of the laws governing such contracts at the time they were entered into; for it being an uncontroverted principle of law, recognized by American legislation and by the legislation in force in the Island, that laws do not have a retroactive effect, it could not have been the intention of the Congress of the United States to rescind such contracts, which, furthermore, were also protected by Section 8 of the Treaty of Paris; and consequently, in holding that the estate of Serrallés was bound to pay the amounts claimed by the plaintiff Belén Esbri, in the manner provided by clause 3 of the deed of October 6, 1894, the Court has not violated the aforesaid legal provision, and the appeal, as based on this further allegation, cannot properly be admitted.

Neither has there been any violation of the rules for the interpretation of contracts contained in articles 1281, 1283, 1284 and 1289 of the Civil Code; for the terms of clause 3 of the contract of purchase and sale dated October 6, 1894, being clear and leaving no doubt as to the intention of the contracting parties, the Ponce Court has confined itself to an application thereof in its literal sense, in strict compliance with the provisions of the first-mentioned article. Nor has article 1283 been violated, because if the trial Court, in view of the documents and other evidence introduced has considered (and said consideration has not been in due legal form shown to be error,) that the will of the contracting parties upon executing the contract of purchase and sale of October 6, 1894, was such as had been clearly and definetely expressed in the clauses of aforesaid contract, in holding the estate of Serrallés to a strict compliance with the terms of clause 3 of the deed, agreeably to the general

pruebas practicadas, y contra cuya apreciación no se ha demostrado en la forma legal correspondiente que hubiera incurrido en error, que la voluntad de las partes contratantes, al otorgar el contrato de compra-venta de 6 de Octubre de 1894, fué tal y como resulta clara y terminantemente expresada en las cláusulas del referido contrato, al condenar á la Sucesión Serrallés al estricto cumplimiento de lo convenido en la cláusula 3ª de la escritura de aquella fecha, con toda la generalidad de los términos en que aparece redactada, y sin limitación de casos, no ha infringido el artículo 1283 del Código Civil, como supone la parte recurrente, á diferencia de lo ocurrido en el caso de Doña Josefa Cayol y Juliá y la Sociedad Agrícola Balseiro y Georgetti, fallado recientemente por este Tribunal Supremo y en el que, ni las partes habían hecho constar su voluntad de manera tan clara y explícita como en el caso presente, ni el caso podía ofrecer dificultad, cuando la misma parte demandante había reconocido en la demanda, y resultaba probado en el pleito, que la cláusula de la escritura de cuya aplicación se trataba, y en la que fundaba sus pretensiones para pedir que los compradores Balseiro y Georgetti le pagaran los intereses de la parte del precio aplazado en la moneda americana circulante, sin el descuento fijado por el Gobierno de los Estados Unidos sobre la extinguida moneda del país, la habían establecido las partes en contemplación al canje de la moneda mejicana, que ya se había anunciado por el Gobierno Español á la fecha de la celebración del contrato, por cuya razón hubo este Tribunal Supremo de desestimar el recurso de casación interpuesto por la demandante Doña Josefa Cayol, contra la sentencia pronunciada por el Tribunal de Distrito de Arecibo, que desestimó las pretensiones de dicha parte, fundado precisamente en ese mismo artículo 1283 del Código Civil, de cuya aplicación se trata en el presente recurso.

*Considerando :* que tampoco infringe la sentencia las otras reglas de interpretación á que se refieren los artículos 1284 y

sense and scope thereof, without any limitation whatever as to circumstances, has not violated article 1283 of the Civil Code, as claimed by apellant. The contrary was the case with the point raised between Josefa Cayol y Juliá and the agricultural firm Balseiro & Georgetti, recently decided by this Supreme Court, in which the parties had not stated their intention in so clear and explicit a manner as in the case at bar, nor could it offer any difficulty inasmuch as the plaintiff herself had acknoweledged in the complaint, and it was shown at the trial, that the clause of the deed in question on which she based her claim that the vendees, Balseiro & Georgetti should pay the interest on the outstanding portion of the price in American currency, without making the discount established by the Government of the United States, upon the former money of the country, had been agreed upon by the parties in expectation of the exchange of the Mexican coin, which had been announced by the Spanish Government at the time the contract was entered into. For this reason the Supreme Court dismissed the appeal in cassation taken by the plaintiff Josefa Cayol from the judgment rendered by the District Court of Arecibo, which had denied the claims of said party, on the strength of article 1283 of the Civil Code, the application of which is under consideration in the present appeal.

Nor has the judgment violated the other rules of interpretation referred to in articles 1284 and 1289 of the Civil Code, for if by clause 3 of the deed of October 6, 1894, the vendee Juan Serrallés engaged to pay the stipulated installments at the rate of one hundred cents current money, whatever might be the coin, for every *peso* of Mexican money, nothing is more logical or adequate for the fulfillment of the contract than that the estate of Serrallés should now pay the income due the heirs of the vendor, Cartagena, at the rate of one hundred cents American money, the present legal tender, for every Mexican *peso;* and the installments and income yet to mature, in the money in circula-

1289 del Código Civil, puesto que si por la cláusula 3ª de la escritura de 6 de Octubre de 1894 se obligó el comprador Don Juan Serrallés á pagar los plazos estipulados, á razón de cien centávos de la moneda circulante, cualquiera que fuere su cuño, por cada un peso de la moneda mejicana, nada más lógico, ni más adecuado, para el cumplimiento del contrato, que la Sucesión Serrallés pague hoy las rentas vencidas á los causahabientes del vendedor Don José Nicolás de Cartagena, á razón de cien centavos de la moneda americana, que es la circulante, por cada un peso de la moneda mejicana; y los plazos y las rentas que están por vencer, en la moneda que circule á su vencimiento, en la misma proporción establecida; en estricto cumplimiento del contrato, que es la ley entre los contratantes, y que siendo igual para todos, no quebranta la reciprocidad de intereses que debe existir entre ambas partes.

*Considerando*: que no son de estimarse las infracciones de leyes citadas con más ó ménos oportunidad en la sentencia, pero que no sirven de fundamento á la parte dispositiva del fallo, en cuyo caso se encuentran los artículos del Código Civil que se citan en el 5º motivo del recurso.

*Considerando*: por todo lo expuesto, que no procede estimarse el recurso por ninguno de los motivos que se alegan, únicos que puede considerar este Tribunal, con arreglo á los preceptos de la Ley de Enjuiciamiento Civil y Orden General Nº 118, que regulan el ejercicio del recurso extraordinario de casación contra las sentencias definitivas pronunciadas por los Tribunales de Distrito en única instancia, y en juicio oral y público. en los asuntos civiles.

*Fallamos:* que debemos declarar y declaramos, no haber lugar al recurso de casación interpuesto por el representante de la Sucesión de Don Juan Serrallés y Colón, contra la expresada sentencia del Tribunal de Distrito de Ponce, con las costas al recurrente.

Jueces concurrentes: Sres. Hernández y Figueras.

Jueces disidentes: Sres. Sulzbacher y MacLeary.

tion when they fall due, in the same proportion agreed upon, in strict compliance with the terms of the contract, which is the law between the contracting parties, and being equal for all, does not impair the reciprocity of interests that should exist between both parties.

The violation of the laws cited more or less pertinently in the judgment, but which did not serve as bases for the decision arrived at, such as the articles of the Civil Code mentioned in the 5th allegation should not be considered.

For the reasons above set forth the appeal cannot be sustained as based on any of the grounds urged, which are the only ones of which this Court can take cognizance under the provisions of the Law of Civil Procedure and of General Order No. 118, governing appeals in cassation from final judgments of the District Courts in civil matters.

We, therefore, should declare, and do declare, that the appeal in cassation taken by the representative of the estate of Juan Serrallés y Colón, from the aforesaid judgment of the District Court of Ponce, does not lie, and impose upon him the costs.

Messrs. Justices Hernández and Figueras, concurring.

Messrs. Justices Sulzbacher and MacLeary, dissenting.

---

*Dissenting Opinion of Mr. Justice Sulzbacher.*

The facts in this case are set out fully in the decision of the majority of the court, and therefore for the purposes of this dissenting opinion it is only necessary to make the following statement: The defendant and appellant Eduardo Wellenkamp y Chelva, attorney in fact of Don Juan Serrallés y Colón, in consideration of certain real estate sold and conveyed to the latter by Nicolás Cartagena y Man-

*Opinión disidente del Juez Asociado Sr. Zulzbacher.*

Los hechos de este caso están expresados extensamente en la sentencia dictada por la mayoría del Tribunal, y por lo tanto, á los fines de esta opinión disidente, solamente es necesario hacer las siguientes manifestaciones: El demandado y apelante, Eduardo Wellemkamp y Chelva, apoderado de Don Juan Serrallés y Colón, por razón de cierta propiedad inmueble vendida y traspasada al último por Don Nicolás Cartagena y Mangual, otorgó en Octubre de 1894, ante un Notario Público de Ponce y con arreglo á derecho, una escritura de reconocimiento de deuda á favor de dicho Nicolás Cartagena, en la que existe la siguiente cláusula:

"Dicha venta se efectúa por la suma de diez y ocho mil pesos, moneda comercial, que se pagarán por el comprador Don Juan Serrallés y Colón, á quien deja obligado el compareciente Don Eduardo Wellemkamp y Chelva, y los percibirá el compareciente Don José Nicolás de Cartagena, en los plazos siguientes: dos mil pesos el día 15 de Julio del año 1898; otros dos mil pesos en igual día y mes de 1899; igual suma de dos mil pesos en 15 de Julio del año 1900; y tres mil pesos en cada día 15 de Julio de los años 1901 al 1904, ambos inclusives, todos de moneda corriente en el comercio, sea cual fuere el cuño de la moneda que con tal carácter circule ó esté aceptado en esta Provincia, á razón de cien centavos de la moneda circulante por cada un peso y con exclusión de toda clase de papel moneda creado ó por crear, aún cuando su circulación fuere forzosa."

La Corte de Distrito de Ponce resolvió, que con arreglo á las estipulaciones de dicho contrato, el demandado, apelante ante este Tribunal, debe pagar ahora dollars americanos en lugar de pesos, que era la moneda de plata española, no solamente en pago de las cantidades debidas en la fecha de la interposición de la demanda, sino también, en pago de todas las cantidades que en adelante vencieren, con arreglo á dicho contrato. Contra esta sentencia apeló el demandado para ante este Tribunal.

La mayoría del Tribunal sostiene, que la apelación del demandado no ha sido bien interpuesta; que el escrito de su apelación no es suficiente y no expresa con claridad y precisión los errores del Tribunal sentenciador. La resolución es

gual, did, in the month of October, 1894, in the town of Ponce, make and execute before a notary public and in due form of law a certain document of indebtedness to said Nicolás Cartagena, wherein exists the following clause :

"Said sale is made for the sum of eighteen thousand pesos, commercial money, which shall be paid by the purchaser, Don Juan Serrallés y Colón, who is obligated thereto by Don Eduardo Wellenkamp y Chelva, who appears before him (the notary), and to be received by Don José Nicolás Cartagena, who is also present, in the following instalments: two thousand pesos on the 15th day of July 1898 ; two thousand pesos more on the same day and month of 1899 ; an equal amount of two thousand pesos on the 15th day of July of the year 1900 ; and three thousand pesos on every 15th day of July of the years 1901 to 1904, both inclusive ; all in current money of commerce, whatever the coinage of money may be, and of such character as may be circulating or be accepted in this Province, at the rate of one hundred cents of the circulating money on every peso, and to the exclusion of all kinds of paper money established, or which may be established, although its circulation may be legal tender."

The District Court of Ponce held, that under the provisions of said contract, the defendant, the appellant in this Court, is required now to pay American dollars instead of "pesos", which were the Spanish silver coin, not only in payment of the amounts due at the time of the filing of the suit, but also in payment of all the amounts thereafter to become due under said contract. From this decision the defendant appeals to this Court.

The majority of the court holds that the defendant's appeal is not well taken ; that the writing of his appeal is insufficient and does not set out with clearness and precision the errors of the trial court. The decision is to the effect that the appeal be dismissed. But nevertheless the court proceeds to give its construction to the contract, accepting the same as was expressed by the District Court of Ponce. Neither in this disposition of the case nor in the construction of the contract am I able to concur.

It is contended that the Supreme Court of Porto Rico is a "court of cassation," and for that reason the spanish law

al efecto de que se desestime la apelación. Pero, sin embargo, el Tribunal procede á interpretar el contrato, aceptando la interpretación que le diera la Corte de Distrito de Ponce. No puedo estar de acuerdo con la resolución dictada en este caso, ni con la interpretación que se ha dado al contrato.

Se sostiene que el Tribunal Supremo de Puerto Rico es un "Tribunal de Casación", y que por esa razón, las resoluciones de éste Tribunal deberán ajustarse á la Ley de Enjuiciamiento Española y á la Jurisprudencia del Tribunal Supremo de España. Pero aún, en este caso, parece que el escrito presentado por el demandado, interponiendo recurso de apelación ó de casación, está suficientemente ajustado á aquél sistema de enjuiciar, según los artículos 1690 y 1719 [1] á que se refiere la opinión de la mayoría, y los cuales artículos dicen así:

"Art. 1719 [1].—En el escrito interponiendo el recurso, se expresará el párrafo del artículo 1690 en que se halle comprendido, y se citará con precisión y claridad la ley ó doctrina legal que se crea infringida y el concepto en que lo haya sido.

Si fuesen dos ó más los fundamentos ó motivos del recurso, se expresarán en párrafos separados y numerados".

"Art. 1690.—Habrá lugar al recurso de casación por infracción de ley ó de doctrina legal:

1.—Cuando el fallo contenga violación, interpretación errónea, ó aplicación indebida de las leyes ó doctrinas legales, aplicables al caso del pleito.

2.—Cuando la sentencia no sea congruente con las pretensiones oportunamente deducidas por los litigantes.

3.—Cuando el fallo otorgue más de lo pedido, ó no contenga declaración sobre alguna de las pretensiones oportunamente deducidas en el pleito.

4.—Cuando el fallo contenga disposiciones contradictorias.

5.—Cuando el fallo sea contrario á la cosa juzgada, siempre que se haya alegado esta excepción en el juicio.

6.—Cuando por razón de la materia haya habido abuso, exceso ó defecto en el ejercicio de la jurisdicción, conociendo en asunto que no sea de la competencia judicial, ó dejando de conocer cuando hubiere el deber de hacerlo.

7.—Cuando en la apreciación de las pruebas haya habido error de derecho ó error de hecho, si este último resulta de documentos ó autos auténticos que demuestren la equivocación evidente del juzgador.

_____

(1) Debe decir. 1718.

of procedure and the decisions of the Supreme Court of Spain should be the rule of decision for this court. Even were this the case it seems that the defendant's writing of appeal or of cassation is ample to conform to that system of procedure, according to articles 1690 and 1719 [1] referred to in the majority opinion, and which articles read as follows:

"Art. 1719 [1].—The paragraph of article 1690 upon which the appeal is based shall be stated in the petition, and the law or legal doctrine alleged to have been violated shall be precisely and clearly cited, as well as the manner in which the violation occurred.

If there should be two or more bases or reasons for appeal, they shall be stated in separate and numbered paragraphs."

"Art. 1690.—An appeal for annulment of judgment by reason of violation of law or of legal doctrine shall lie:

1.—When the decision contains a violation, erroneous interpretation, or wrongful application of law or of legal doctrine applicable to the case at issue.

2.—When the judgment is not pertinent to the allegations made by the litigants at the proper time.

3.—When the judgment grants more than is prayed for, or does not contain any declaration upon some of the allegations made in the action at the proper time.

4.—When the decision contains contradictory rulings.

5.—When the decision disallows a plea of *res judicata*, provided that this exception has been pleaded in the action.

6.—When, by reason of the matter at issue, there has been abuse, excess or defect in the exercise of the jurisdiction, whether taking cognizance of a matter which does not come within the jurisdiction of the court or judge, or in not taking cognizance thereof when it is his duty to do so.

7.—If in the consideration of evidence an error of law or of fact should have been committed, provided that the latter error is apparent from documents or authentic acts which show the evident error of the judge."

Although some of appellant's objections stated in his writing of appeal could perhaps have been made more specific, yet, taking them all together, they are sufficient to place the whole case and the document in controversy before this court for consideration and decision.

(1)  Should read 1718.

Aunque algunas de las objeciones del apelante, expresadas en su escrito de apelación, pudieron quizás haber sido más específicas, sin embargo, tomándolas en conjunto, son suficientes para que este Tribunal proceda á considerar y resolver el caso y el documento en controversia.

Sin embargo, soy de opinión, que el Tribunal Supremo de Puerto Rico no es un Tribunal de Casación, sino un Tribunal de Apelación, y que como tal tiene el derecho de considerar el caso en su totalidad y los méritos de las cuestiones controvertidas, sin fijarse en tecnicismos referentes á la manera de su presentación. · Llego á esta conclusión después de haber tomado en consideración la historia de la legislación que ahora rige aquí y el origen de este Tribunal.

Después que el Gobierno de los Estados Unidos ocupó la Isla de Puerto Rico, y mientras se encontraba bajo la administración militar, se adoptaron y promulgaron ciertas disposiciones llamadas "Ordenes Generales", que afectaban el sistema judicial y eran de carácter legislativo, llegando á formar parte de las leyes de Puerto Rico. La Orden General No. 118, promulgada por el Brigadier General George W. Davis, en 16 de Agosto de 1899, es la que hemos de considerar en relación con este caso. Las Cortes de la Isla fueron creadas por virtud de esta Orden General, organizándose un Tribunal Supremo, Cortes de Distrito y Cortes Municipales. La sección 2 de dicha Orden General, dice así:

"Se constituye un Tribunal Supremo de Justicia con residencia fija en la Ciudad de San Juan, y se compondrá de un Presidente y cuatro Jueces Asociados, que reunidos, constituirán su Sala de Justicia, para todos los asuntos civiles y criminales. . . . . . . . . . . ."

Las siguientes secciones de dicha Orden General regulan las apelaciones de las Cortes de Distrito para ante el Tribunal Supremo:

"15.—Los negocios criminales entregados por las cortes y juzgados suprimidos serán continuados en su tramitación por las cortes de distrito. Y los asuntos civiles contenciosos serán asimismo continuados en su tramitación hasta el momento de ser remitidos á prueba, y una vez llegados á ese trá-

I am, however, of the opinion that the Supreme Court of Porto Rico is not a court of cassation, but a court of appeals, and as such has the right to consider the whole case and the merits of the controversy without regard to the technicalities in the manner of its presentation. I arrive at this conclusion by considering the history of the laws now in force here and the origin of this court.

After the occupation by the government of the United States of the Island of Porto Rico, and whilst it was under military administration, a number of regulations called "General Orders" affecting the judicial system, and legislative in character, were adopted and promulgated and became part of the laws of Porto Rico. General Order No. 118 promulgated by Brigadier General George W. Davis, August 16, 1899, is the one which is to be considered in connection with this case. By this General Order the Courts of the island were created, namely, a Supreme Court, District Courts and Municipal Courts. Sections 2 of said. General Order reads as follows:

"There shall be a Supreme Court of Justice with fixed residence in the city of San Juan, composed of a Chief Justice and four Associate Justices, who jointly will constitute the Supreme Bench for all civil and criminal business." * * *

The following sections of said General Order govern appeals from the District Courts to the Supreme Court:

"15.—The criminal business transferred from the abolished courts shall be proceeded with by the district courts. Matters of civil ligitation shall also follow their course up to the step in procedure known as presentation of proofs when they shall be continued under the rules of civil oral suits establised by this General Order. If said business shall have got so far as presentation of proofs, without concluding same, the the remainder shall be heard in oral suit but if the suit be found in a stage of proceedings subsequent to the presentation of proofs it shall be finished and decided by the district courts in conformity with existing proceedings, after public hearing, it being understood that recourse of cassation against the decision shall only be allowed within the dispositions of this general order."

mite, se continuarán por las reglas del juicio oral civil, que esta Orden General establece. Si dichos negocios civiles estuvieren en el trámite de prueba y no hubiere concluido la práctica de ésta, deberán ser vistos en juicio oral para la terminación de la que faltare. Y si se encontraren en trámite posterior á la prueba serán concluidos y fallados por las cortes de distrito con arreglo á la ley hasta ahora vigente y previa vista pública, pero entendiéndose que contra el fallo solo procederá el recurso de casación, conforme á las disposiciones de esta Orden General.

"45.—Contra las sentencias que dicten las cortes de distrito en lo criminal procederá el recurso de casación por infracción de ley ó por quebrantamiento de forma, en los casos que establece la ley de Enjuiciamiento Criminal.

"78.—Procederá el recurso de casación para ante el Tribunal Supremo de todos los asuntos civiles, por infracción de la ley y por quebrantamiento de forma, en los casos que para esta última define la ley de Enjuiciamiento Civil, con excepción de los juicios de que conocieren los jueces municipales.

"80.—En los juicios criminales procederá el recurso de casación por infracción de ley. También procederá por quebrantamiento de forma, en los casos establecidos por la ley de Enjuiciamiento Criminal.

"81.—El recurso de casación se interpondrá ante la Corte de Distrito que hubiere dictado la sentencia en el plazo improrrogable de 10 días, á contar desde el siguiente al en que hubiese sido notificada aquella.

"82.—La Corte de Distrito decidirá sobre la admisión del recurso, solamente cuando fuere por quebrantamiento de forma y contra su resolución denegatoria podrá acudirse en queja ante el Tribunal Supremo, en el término de quince días. Al efecto la Corte de Distrito siempre que deniegue un recurso de casación por quebrantamiento de forma mandará expedir á favor de la parte que lo hubiere interpuesto, copia literal y certificada de la sentencia objeto de aquél, en el plazo improrrogable de tercero día, y dispondrá además la citación y emplazamiento de las partes para su comparecencia ante el Tribunal Supremo.

"83.—El recurso de queja, luego de comparecer el recurrente y de transcurrir el término del emplazamiento, se resolverá inmediatamente por el Tribunal Supremo, previa vista pública, á la que podrán concurrir los letrados defensores de las partes, y con preferencia á los demás asuntos en curso. (1)

Habiendo sido decretadas y establecidas por la Autoridad Militar Americana, y aunque fueron promulgadas en dos

---

(1) En el texto Inglés de estos artículos se usa la palabra "Apelación" en lugar de "Casación", que emplea el texto Español; á excepción de la sección 45 en que se emplea la frase "*Appeal in cassation*", como equivalente á la de "recurso de casación."

"45.—In all cases provided for by the law of criminal procedure appeal in casation will lie against sentences pronounced by the district courts for infraction of law or error in procedure."

"78.—Appeal to the Supreme Court will lie in all civil suits for infraction of law and error in procedure in the cases which the law of civil procedure defines for the latter, but not for suits heard before municipal courts."

"80.—In criminal trials appeal may be taken for infraction of law and error in procedure in cases defined by the law of criminal procedure."

"81.—Notice of appeal shall be giving to the sentencing court not later than ten days after the day of notification of sentence."

"82.—The District Court shall decide whether to allow the appeal only when such is to be taken for error in procedure, and its decision adverse may be appealed against before the Court within fifteen days. For this purpose the district court when denying right of appeal shall grant a literal and certified copy of the ruling against which appeal was sought to the party appealing within three days at the latest, and besides shall order both sides to appear before the Supreme Court."

"83.—On the termination of the time allowed for appearance and on the appearance of the apellant, the Supreme Court after public hearing shall immediately give a decision on the appeal against the ruling of the lower court debarring right of cassation. The lawyers for both sides may be present, and the matter must be decided before all other business in hand." [1]

They having been enacted and established by American military authority, and although promulgated in two languages, there can be no doubt but that the English must be held to be the original.

It is evident therefore that in civil matters, at least, the Supreme Court is a Court of appeals and not a court of cassation.

From a different aspect, however, must the courts and the laws of Porto Rico be viewed and construed after the passage by the Congress of the United States of the Organic Act of Porto Rico, being entitled: "An act temporarily to to provide revenues and a civil government for Porto Rico, and for other purposes", aproved April 12, 1900, especially in view of the following sections of said act:

"Section 8.—That the laws and ordinances of Porto Rico now in force

---

[1] In the Spanish text of these sections use is made of the word "*casación*" instead of appeal ("*apelación*") which is used in the English; except in section 45 wherein the phrase "*recurso de casación*" is used as the equivalent of "appeal in cassation."

idiomas, no puede haber duda alguna de que el Inglés debe considerarse como el texto original.

Es evidente, por lo tanto, que por lo menos en asuntos ci- viles, el Tribunal Supremo es un Tribunal de Apelación y no un Tribunal de Casación.

Sin embargo, las Cortes de Puerto Rico deben ser consideradas, y sus leyes interpretadas, bajo un punto de vista distinto después de la aprobación, por el Congreso de los Estados Unidos, de la Ley Orgánica de Puerto Rico, titulada: "Ley para Proveer, Temporalmente, de Rentas y un Gobierno Civil á la Isla de Puerto Rico, y para otros fines", aprobada en 12 de Abril de 1900, principalmente por virtud de lo dispuesto en las siguientes secciones de dicha ley:

"Sección 8.—Que las leyes y ordenanzas de Puerto Rico, actualmente en vigor, continuarán vigentes, excepto en los casos en que sean alteradas, enmendadas ó modificadas por la presente; ó hayan sido alteradas, ó modifica- das por órdenes militares y decretos vigentes cuando esta Ley entre á regir, y en todo aquello en que las mismas no resulten incompatibles ó en conflicto con las leyes estatutarias de los Estados Unidos, no inaplicables localmente, ó con las presentes disposiciones, hasta que sean alteradas, enmendadas ó revo- cadas por la Autoridad Legislativa creada por la presente para Puerto Rico, ó por una ley del Congreso de los Estados Unidos................"

"Sección 33.—Que el poder judicial residirá en las Cortes y Tribunales de Puerto Rico establecidos ya y en ejercicio, incluyendo los Juzgados Muni- cipales creados en virtud de órdenes generales, número 118, promulgadas por el Brigadier General Davis, Voluntarios de los Estados Unidos, en Agosto 18 de 1899, incluyendo también los Tribunales de Policía estableci- dos por Ordenes Generales, número 175, promulgadas en Noviembre 29 de 1899, por el Brigadier General Davis, Voluntarios de los Estados Unidos, y las leyes y ordenanzas de Puerto Rico y sus Municipios que se hallan vigen- tes en todo lo que no se oponga á esta Ley, y por la presente se declaran subsistentes dichas cortes y tribunales............"

Aunque la sección ocho dice: "que las leyes y ordenanzas de Puerto Rico actualmente en vigor, *continuarán* vigentes, excepto en los casos en que sean alteradas, enmendadas ó modificadas, etc.," debe sostenerse, sin embargo, que por virtud de dicha ley, y á manera de restablecimiento, las leyes de Puerto Rico fueron creadas por el Congreso ameri-

shall continue in full force and effect except as altered, amended or modified hereinafter, or as altered or modified by military orders and decrees in force when this act shall take effect, and so far as the same are not inconsistent or in conflict witch the statutory laws of the United States not locally inapplicable or the provisions hereof, until altered amended or repealed by the legislative authority hereinafter provided for Porto Rico or by act of Congress of the United States." * * *

"Section 33.—That the judicial power shall be vested in the courts and tribunals of Porto Rico as already established and now in operation, including municipal courts under and by virtue of General Orders numbered one hundred and eighteen, as promulgated by Brigadier-General Davis, United States Volunteers, August 16, 1899, and including also the Police Courts established by General Orders numbered 195, promulgated November 29, 1899, by Brigadier General Davis, United States Volunteers, and the laws and ordinances of Porto Rico and the municipalities thereof in force, so far as the same are not in conflict herewith, all which courts and tribunals are hereby continued." * * *

Although section 8 reads that the laws and ordinances in Porto Rico now in force shall *continue* in force and effect, except as altered, amended, etc., it should nevertheless be held that by said act the laws of Porto Rico became creatures of Congress and American laws by re-enactment; and that they must be construed in accordance and in conformity with the spirit, application, tendency and policy of American jurisprudence, and everything contrary thereto, or inconsistent, incompatible or unsuitable, must fall without any special legislative action in that respect. And although said section 33 provides "that the judicial powers shall be vested in the courts and tribunals of Porto Rico as already established", * * * "all of which are hereby *continued*", they became thereby courts created and established by the Congress of the United States. It could not have been the intention of the military government, and certainly not that of Congress, to make and constitute the Supreme Court of Porto Rico a court of cassation, thereby giving it all the attributes of the Supreme Court of Spain. American doctrines and theories must control the courts of Porto Rico

cano y por Leyes americanas; y que deben ser interpretadas y ajustadas al espíritu, aplicación, tendencia y fines de la Jurisprudencia americana, y todo lo que á ello se opusiere, ó estuviere en conflicto ó fuere incompatible ó inadecuado, debe desaparecer sin necesidad de ningún acto legislativo especial para ese fin. .Y aunque dicha sección 33 prescribe "que el poder judicial residirá en las cortes y tribunales de Puerto Rico establecidos ya" ..................... "todos los cuales se declaran *subsistentes* por la presente", por virtud de esa prescripción se convirtieron en Tribunales creados y establecidos por el Congreso de los Estados Unidos. No pudo haber sido la intención del Gobierno Militar, é indudablemente, tampoco, la del Congreso, la de hacer y constituir al Tribunal Supremo de Puerto Rico en un Tribunal de Casación, dándole por ello todos los atributos del Tribunal Supremo de España. Las doctrinas y principios americanos deben regular las Cortes de Puerto Rico hasta en la interpretación de las Leyes de España que aun se encuentran en los Estatutos de Puerto Rico.

Es un principio de derecho reconocido en los Estados Unidos, y adoptado por este Tribunal, que cuando las leyes de un país extranjero han de ser consideradas por las Cortes de los Estados Unidos, deberán ser interpretadas de acuerdo con la Constitución, instituciones, espíritu y jurisprudencia de las Cortes de la última Nación, sin consideración alguna á la interpretación que las cortes ú otros cuerpos del país extranjero hayan dado á dichas leyes.

En un pleito pendiente ante el Tribunal Supremo de los Estados Unidos y en el que se discutía si una sociedad extranjera era una corporación ó una sociedad anónima, el Tribunal dijo:

"Se sostiene además, que las diferentes leyes del Parlamento, que hemos mencionado, declaran expresamente que no han de entenderse en él sentido de constituir á tales Cuerpos en Corporaciones.

Pero cualquiera que sea el efecto de semejante declaración en las Cortes de aquel país, no puede alterar la naturaleza esencial de una Corporación, ó impedir que las Cortes de otra jurisdicción investiguen su verdadero carácter,

even in the construction of the laws of Spain, which are still found on the statute books of Porto Rico.

It is a principle of law recognized in the United States and adopted by this court that, when the laws of a foreign country come under consideration by the courts of the United States, they will be construed in accordance with the constitution, institutions, spirit and jurisprudence of the latter's courts, irrespective of the construction of the courts or other bodies of foreign countries.

In a suit before the Supreme Court of the United States as to whether a certain foreign institution was a corporation or joint stock company, the court said:

"It is also urged that the several acts of Parliament we have mentioned expressly declared that they shall not be held to constitute the body a corporation.

But whatever may be the effect of such declaration in the courts of that country, it cannot alter the essential nature of a corporation or prevent the courts of another jurisdiction from inquiring into its true character whenever that may come into issue. It appears to have been the policy of the English law to attach certain consequences to incorporated bodies, which rendered it desirable that such associations as these should not become technically corporations. Among these, it would seem from the provisions of these acts, is the exemption from individual liability of the shareholder for the contracts of the corporation. Such local policy can have no place here in determining whether an association whose powers are ascertained and its privileges conferred by law, is an incorporated body." *Liverpool & London Life and Fire Insurance Company.* v. *Henry K. Oliver, Treasurer.* 10 Wall. 566-577.

I, therefore arrive at the conclusion that since courts of cassation, rules of cassation and appeals of cassation are foreign to our laws and legal system; they must be construed and interpreted so as to be in harmony with the legal procedure and methods governing courts in the United States.

Writs of error have not yet been enacted in Porto Rico, and the Supreme Court should therefore be considered a

en cualquier caso en que este punto venga á discusión.    Parece que ha sido. la tendencia del derecho inglés fijar ciertas consecuencias á las organizaciones incorporadas, las que han hecho que sea preferible que asociaciones como éstas no tengan el carácter técnico de corporaciones.    Entre estas consecuencias, según se desprende de las disposiciones de estas leyes, está la exención de responsabilidad personal de los accionistas por los contratos de la corporación.    Semejante tendencia local no puede tener aquí influencia alguna al determinar si una asociación cuyas facultades están fijadas, y sus privilegios conferidos por la ley, es una organización incorporada.    *Liverpool & London Life & Fire Insurance Company* v. *Henry K. Oliver, Treasurer,* 10 Wall, 566-577."

Por lo tanto, llego á la conclusión de que toda vez que los Tribunales de casación, las reglas de casación y las apelaciones en casación, son extraños á nuestras leyes y á nuestro sistema legal, deben ser interpretados en armonía con el procedimiento legal y con los métodos que regulan las Cortes de los Estados Unidos.

Los *recursos por causa de error* (*Writs of error*) no han sido establecidos en Puerto Rico y por consiguiente el Tribunal Supremo debe ser considerado como Tribunal de apelación, con facultades para revisar los errores que aparezcan de los autos.

Las Cortes de más alta jurisdicción de los Estados Unidos han resuelto en general que cuando de los autos aparece claramente algún error, no necesita presentarse siquiera por medio de un pliego de excepciones; pero en el caso presente el apelante ha señalado extensamente los errores en que ha incurrido el Tribunal sentenciador en sus resoluciones.    El otorgamiento del documento que se discute no se ha negado por el demandado y apelante.    Por lo tanto, no pudo haber ninguna otra prueba apropiada ante el Tribunal inferior que el documento mismo.    La interpretación que al mismo ha de darse es la única cuestión discutida, que no puede ser afectada por ningún testimonio verbal.

Es un hecho histórico, del cual el Tribunal debió haber tomado conocimiento judicial, que en varias ocasiones, durante el Gobierno Español, el medio circulante había de sufrir muchos cambios, y en la fecha del otorgamiento del

court of appeals, with power to review any error apparent upon the record.

It has been generally held in the courts of the highest jurisdiction of the United States that where an error is apparent in the record it need not be presented by bill of exceptions even; but in this case the appellant has amply pointed out the errors of the trial court in its rulings. The execution of the document in controversy is not denied by the defendant and apellant. There could, therefore, not have been any other proper evidence before the trial court except the document itself. The construction thereof is the only point in issue, which cannot be affected by any verbal testimony.

It is an historical fact, of which the court should have taken judicial cognizance, that at various periods during the Spanish government, the circulating medium had to undergo many changes, and at about the date of the execution of the document in issue a change from Mexican to Spanish money (*moneda provincial*) had been or was about to be made, the difference being about five per cent. in favor of the latter money.

It is a universal principle of law that courts in construing contracts must place themselves in the attitude of the contracting parties. The Civil Code in force here, recognizing the principle referred to, contains the following sections:

"Art. 1281.—If the terms of a contract are clear and leave no doubt as to the intention of the contracting parties, the literal sense of its stipulations shall be observed.

If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail."

"Art. 1282.—In order to judge as to the intention of the contracting parties, attention must principally be paid to their acts, contemporaneous and subsequent to the contract."

"Art. 1283.—However general the terms of the contract may be, there

documento en cuestión, un cange de la moneda mejicana á la moneda española (*moneda provincial*) había sido verificado, ó estaba próximo á verificarse, siendo la diferencia, próximamente, de un cinco por ciento en favor de la última moneda.

Es un principio de derecho universal que al interpretar los contratos, los Tribunales deben colocarse en la situación de las partes contratantes. El Código Civil vigente aquí, reconociendo este principio, contiene los siguientes artículos:

"Art. 1281.—Si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas.

Si las palabras parecieren contrarias á la intención evidente de los contratantes, prevalecerá ésta sobre aquéllas.

Art. 1282.—Para juzgar de la intención de los contratantes, deberá atenderse principalmente, á los actos de éstos, coetáneos y posteriores al contrato.

Art. 1283.—Cualquiera que sea la generalidad de los términos de un contrato, no deberán entenderse comprendidos en él, cosas distintas y casos diferentes de aquéllos, sobre que los interesados se propusieron contratar.

Art. 1284.—Si alguna cláusula de los contratos admitiere diversos sentidos, deberá entenderse en el más adecuado para que produzca efecto".

Aplicando los principios de derecho que contienen estos artículos, es obvio que las partes contratantes, en la época de las negociaciones, tuvieron en la mente solo el cambio de un "peso" por otro "peso", simplemente un cange de moneda. No sería absolutamente racional presumir que tenían en la mente una guerra con otra nación, un cambio de Soberanía, y como consecuencia de ellas, una variación en su sistema monetario, y del patrón plata, al patrón oro. Tampoco sería razonable presumir que si, por ejemplo, el Reino de Inglaterra hubiera adquirido la Isla de Puerto Rico, se hubieran tenido que pagar libras esterlinas en vez de pesos españoles. Ni podría presumirse, razonablemente, que el acreedor hubiera quedado satisfecho con francos en vez de pesos, en caso de que la República de Francia hubiera venido á ser la Soberana de Puerto Rico. Semejante demanda de un acreedor, ante una Corte de Justicia, sería sumamente ridícula y sorprendente, cuando, como en este caso, al deudor se le obligaría á pagar sesenta y seis por ciento de premio sobre la

should not be understood as included therein things and cases different from those with regard to which the persons interested intend to contract."

"Art. 1284.—If any stipulation of a contract should admit of different meanings, it should be understood in the sense most suitable to give it effect."

Applying the principles of law set forth is these sections, it is obvious that the contracting parties at the time of the negotiations had in mind only the change of one *peso* to another *peso*,—simply a change of currency. It would be most unreasonable to presume that they had in mind a war with another nation, a change in sovereignty, and in consequence thereof a variation in its monetary system, and from silver to a gold standard of values. It would also be irrational to presume that if, for instance, the Kingdom of England had acquired the island of Porto Rico, that instead of Spanish *pesos*, pounds sterling would have to be paid. Nor is it reasonable to presume that the creditor would have been satisfied with francs instead of *pesos* in case the Republic of France had become the sovereign of Porto Rico. Such a demand by a creditor before a court of justice would be most remarkable and extravagant, when, in this instance, the debtor would have been required to pay sixty-six per cent. premium on the amount of his contract. This certainly was never contemplated by the parties. The construction of the District Court of Ponce of the contract in controversy permits of all these extraordinary comparisons.

It is contended that aleatory contracts are authorized in Porto Rico. They are permitted in all countries where contracts depend on future results, but in the construction of such agreements or bargains it must appear that the contracting parties had in mind the contingencies which might arise. A person may buy a growing crop, when both parties would take into consideration an abundant harvest as well as a destruction of the crop by the elements, but that the contracting parties would have in mind the probability of a

totalidad de su contrato. Esto, ciertamente, no pudo entrar en la mente de las partes. La interpretación que la Corte de Distrito de Ponce ha dado al contrato que se discute, permite que se hagan todas estas suposiciones extraordinarias.

Se sostiene que los contratos aleatorios son permitidos en Puerto Rico. En todos los países se permiten contratos que dependan de resultados futuros, pero en la interpretación de tales convenios debe aparecer que las partes contratantes tuvieron en su mente las contingencias que pudieran sobrevenir. Una persona puede comprar una plantación creciente, y ambas partes tendrían presente, tanto una cosecha abundante, como una destrucción que sufriéra la misma por virtud de los elementos, pero sería completamente improbable que las pártes contratantes tuvieran en su mente la probabilidad de una guerra, el cambio de soberanía, y como consecuencia, un cange del sistema monetario.

Parece que este Tribunal ha expresado esta misma opinión en el caso de *Cayol* vs. *Balseiro y Georgetti*, á que se refiere la mayoría de la Corte. La cuestión debatida en ese pleito era un documento otorgado en el año 1894, el mismo año en que se otorgó el contrato que se discute en este caso, y en el que se discutía el mismo ó semejante principio. Aquel documento contenía lá siguiente cláusula :

"Y el resto del precio ascendente á veinte mil pesos, moneda corriente á su vencimiento, lo pagará............ en oro ó plata, con exclusión de todo papel moneda".

El acreedor alegaba que todos los pagos que vencieran después de la aprobación de la mencionada ley del Congreso de 12 de Abril de 1900, tendrían que hacerse en dollars americanos, en lugar de.pesos. Sin embargo, este Tribunal, sosteniendo lo contrario, al expresar su opinión por medio del Juez Presidente Sr. Quiñones, dijo :

"Esto no obstante, y aún cuando hubiera de estimarse que los veinte mil pesos del precio aplazado debían entenderse de la moneda corriente á su vencimiento, y pagaderos á la par lo mismo que los intereses convenidos, todavía no estaría justificada la acción intentada por Doña Josefa Cayol contra Balseiro y Georgetti; pues, inspirada como lo fué aquella cláusula de la escritura,

war, a change of sovereignty, and a consequent change of the monetary system, is highly improbable.

These views have seemingly been expressed by this court in the suit of *Cayol* vs. *Balseiro y Georgetty,* referred to by the majority of the court. The controversy in that suit was a document made and executed in 1894, the same year of contract in this suit, and involving a similar or the same principle. Therein appeared the following clause:

"And the balance of the price, amounting to twenty thousand *pesos* current money at the time the same becomes due and payable shall be paid * * * in gold or silver, to the exclusion of all paper money."

The creditor contended that all payments due him after the passage of the above mentioned act to Congress, of April 12, 1900, would have to be made in American dollars instead of *pesos.* This court, however, holding otherwise, and speaking through Mr. Chief Justice Quiñones, states:

"Notwithstanding, and although it could not be considered that the purchase price of twenty thousand *pesos* and interest must be held to be current money at the time the same becomes due and payable at par, nevertheless the suit by Mrs. Josefa Cayol against Balseiro y Georgetty, is not maintainable. Convinced, as seemingly she was by the clause of the instrument, as she alleges in her suit, on account of the prospective change of currency which was expected from Mexican money, that the twenty thousand *pesos* and interest to be paid in such money as should be substituted therefor. The change of money having been established without considering the difference which could result in the relative value between the one and the other, the stipulation between the parties only referred to a special and particular case, and could have no application to an incident entirely different and to one which the parties could not foresee; for such would be beyond the limits of human prevision."

"For this reason such events could not enter into the calculations and deliberations of the contracting parties that a change of money would be established five years thereafter by the American government in consequence of the change of sovereignty which happened in this island; because once provincial money was substituted for Mexican money, that thereafter the currency of the United States of America, with a discount of forty per cent. of its value should take its place. Hence on account of this extraordinary and unexpected event, article 1283 of the Civil Code is applicable, which says:

según lo consigna en su demanda la misma parte actora, en la perspectiva del cange que se esperaba de la moneda mejicana y en el propósito de que los veinte mil pesos del precio aplazado, y sus intereses, se pagaran en la moneda que la sustituyera, una vez realizado el cange, sin consideración á la diferencia que pudiera resultar en el valor relativo de una y otra, esa estipulación establecida por las partes para un caso especial y concreto, no puede tener aplicación para otro caso completamente distinto, que las partes no pudieron preveer, porque no cabía en los límites de la previsión humana, y por consiguiente, que no pudo entrar en los cálculos y combinaciones de las partes contratantes, cual lo es el otro cange decretado cinco años después, por el Gobierno americano, á consecuencia del cambio de Soberanía, ocurrido en esta Isla, y por virtud del cual la moneda provincial, que sustituyó á la mejicana, fué sustituida á su vez, por la de los Estados Unidos de América, con un quebranto de un cuarenta por ciento de su valor, y á cuyo caso, por lo extraordinario é imprevisto, es de perfecta aplicación el artículo 1283 del Código Civil, según el cual, "cualquiera que sea la generalidad de los términos de un contrato, no deberán entenderse comprendidos en él cosas distintas ni casos diferentes de aquéllos, sobre que los interesados se propusieron contratar".

La Ley del Congreso de los Estados Unidos, de 12 de Abril de 1900, mencionada anteriormente, dice así:

"Sección 11.—Que para recoger la moneda acuñada de Puerto Rico actualmente en circulación en la Isla y sustituirla con moneda del cuño de los Estados Unidos, por la presente se autoriza al Secretario de Hacienda para cangear, á su presentación en Puerto Rico, todas las monedas de plata de Puerto Rico conocidas con el nombre de *pesos,* y todas las demás monedas locales de plata y de cobre actualmente en circulación en Puerto Rico, no incluyéndose las introducidas en el país después del día 1º de Febrero de 1900, al actual tipo de cambio ó sea sesenta centavos, moneda acuñada de los Estados Unidos, por peso de cuño puertorriqueño, aplicándose el mismo tipo al cange de las piezas menores ó fraccionarias . . . . . . . . *Disponiéndose, sin embargo:* que todas las deudas pendientes al empezar á regir la presente ley, serán pagaderas en la moneda de Puerto Rico actualmente en circulación, ó en moneda de los Estados Unidos, al tipo de cambio ya citado."

El apelante debía al apelado la suma mencionada en dicho documento, el día 12 de Abril de 1900, ó sea, el mismo día en que empezó á regir dicha Ley del Congreso. Dicha Ley declaraba que todas las deudas pendientes en aquella fecha serían pagaderas en la moneda de Puerto Rico, entonces en circulación, ó en moneda de los Estados Unidos á razón de

"However general the terms of a contract may be, there should not be understood as included therein things and cases different from those with regard to which the persons interested intended to contract."

The Act of the Congress of the United States of April 12, 1900, above stated, reads as follows:

"Section 11.—That for the purpose of retiring the Porto Rican coins now in circulation in Porto Rico and substituting therefor the coins of the United States, the Secretary of the Treasury is hereby authorized to redeem, on presentation in Porto Rico, all the silver coins of Porto Rico known as the *peso* and all other silver and copper Porto Rican coins now in circulation in Porto Rico, not including any such coins that may be imported into Porto Rico after the first day of February, 1900, at the present established rate of sixty cents in the coins of the United States for one *peso* of Porto Rican coins, and for all minor and subsidiary coins the same rate of exchange shall be applied. * * * *Provided, however,* that all debts owing on the date when this Act shall take effect shall be payable in the coins of Porto Rico now in circulation, or in the coins of the United States at the rate of exchange above named."

The amount in said document mentioned was owing by appellant to apellee on the 12th day of April 1900, the day when said Act of Congress did take effect. By said Act it was declared that debts owing on that date should be payable in the coins of the Porto Rico, then in circulation, or in coins of the United States at the rate of sixty cents for every *peso*; of course at the election of the debtor.

The judgment of the District Court of Ponce, holding that instead of *pesos* due plaintiff the defendant should pay "dollars", is in violation of said section 11 of said Act of Congress thereby giving it a retroactive character. The appellant in his writing of appeal duly excepts to this ruling and to all the verbal evidence before the trial court; claiming the privilege conceded by the Act of Congress to pay sixty cents, money of the United States, for every *peso* he owed.

It was not, nor could it have been, the intention of Congress to change or affect contracts made in Porto Rico prior

sesenta centavos por cada peso; desde luego á elección del deudor.

La sentencia de la Corte de Distrito de Ponce, disponiendo que por cada peso que se deba al demandante, el demandado debe pagar "dollars," infringe dicha sección 11 de la mencionada Ley del Congreso, dándole, en su virtud, carácter retroactivo. Excepciones á esta resolución fueron debidamente tomadas por el apelante en su escrito de apelación, así como también á toda la prueba testifical que se presentó ante el Tribunal sentenciador; reclamando además el privilegio que le concede la Ley del Congreso de pagar sesenta centavos, moneda de los Estados Unidos, por cada peso que debiera.

No fué, ni podía haber sido, la intención del Congreso cambiar ó afectar los contratos celebrados en Puerto Rico con anterioridad al tratado de Paz entre los Estados Unidos y el Reino de España. Deben ser respetados como existían, y sin cambio alguno.

El apelado tenía ciertos derechos adquiridos por virtud del contrato ó documento en controversia, tales como la suma de dinero que á él le debía el apelante; sujetos, sin embargo, á las condiciones estipuladas de que un peso sería sustituido por otro peso, en el caso de que el Gobierno de España hubiera cangeado la moneda de la Provincia de Puerto Rico. Los derechos adquiridos entre las partes contratantes no deben ser afectados por el cambio de Soberanía; no pueden ser ni aumentados ni disminuidos por legislación alguna del nuevo Gobierno.

"Este es el principio de la Ley de las Naciones, tal como se ha explicado por las más altas Autoridades. En el caso de *The Fama,* en el 5 C, Rob. 106, Sir William Scott declara "que es un principio de derecho internacional bien establecido, que los habitantes de un país conquistado cambian su alianza, extinguiéndose sus relaciones para con su anterior soberano; pero las relaciones entre unos y otros, y sus derechos de propiedad, que no le hayan sido quitados por mandato del conquistador, no habrán de sufrir cambio alguno."

*Eugene Leitensdorfer et al.* vs. *James J. Webb.* 20 Howard 176. (U. S.)

Al retirar el Congreso la moneda de Puerto Rico y susti-

to the Treaty of Peace between the United States and the Kingdom of Spain. They should remain undisturbed, and unchanged.

The appellee had certain vested rights by virtue of the contract or document in controversy, namely the amount due him by the appellant; subject, however, to the agreed conditions that one *peso* should be substituted for another *peso*, in the event the government of Spain should have changed the currency in the province of Porto Rico. Vested rights between contracting parties must remain unaffected by the change of sovereignity; they can be neither increased nor diminished by any legislation of the new government.

tuirla con moneda de los Estados Unidos, fijó el valor de la moneda retirada solamente, y declaró qué cantidad ó proporción de moneda de los Estados Unidos debería pagar el deudor á su acreedor, en vez de pesos, en deudas pendientes á la fecha de la aprobación de la Ley, si así lo prefería el deudor.

Por las varias razones que hemos expresado somos de opinión que el Tribunal Supremo debió haber revocado la sentencia de la Corte de Distrito de Ponce, y, según lo autorizan las leyes vigentes aquí, debió haber dictado resolución en el sentido de que el apelante pagara al apelado las sumas de dinero vencidas ó por vencer, ya en la moneda de Puerto Rico que estaba en circulación el día 12 de Abril de 1900, ó en moneda americana, ó dollars, á razón de sesenta centavos por cada peso.